No. 56,283

EDWARD E. GILES, *Appellee*, v. ADOBE ROYALTY, INC., *et al.*,
*Appellants*.

(684 P.2d 406)

Opinion filed June 8, 1984.

*Richard L. Friedeman*, of Conner, Opie & Friedeman, of Great Bend, argued the cause, and *Fred L. Conner* and *Glenn Opie*, of the same firm, were with him on the brief for the appellants.

*Rae E. Batt*, of Kinsley, argued the cause and was on the brief for the appellee.

The opinion of the court was delivered by

HERD, J.: This is an action by Edward E. Giles to quiet the title to the following described real estate situated in Edwards County, to-wit:

"The West Half of the Southeast Quarter (W/2 SE/4) and the East Half of the Southwest Quarter (E/2 SW/4) of Section Twenty-seven (27), and the Southwest Quarter (SW/4) of Section Thirty-four (34); All in Township Twenty-six (26) South, Range Sixteen (16) West of the Sixth Principal Meridian."

Appellants counterclaimed seeking to quiet the title in them to an undivided one-half interest in the minerals under the real estate. They filed a motion for summary judgment which was denied. Judgment was then entered for appellee, Giles. This appeal followed.

This dispute arose as follows. On December 1, 1922, Jasper Fisk and his wife, Vivian Fisk, executed a note secured by a mortgage on the above real estate to the Kansas City Joint Stock Land Bank of Kansas City, Missouri. It then assigned the note

and mortgage to Phoenix Joint Stock Land Bank of Kansas City. At the time of the execution of the note and mortgage, the Fisks were the owners in fee simple of the real estate. On December 20, 1928, they conveyed in perpetuity an undivided one-half interest in and to the oil, gas and other minerals therein to Harold F. Young of 806 Perrine Building, Oklahoma City, Oklahoma, subject to the mortgage. Young later conveyed an undivided one-fourth of the minerals under the real estate to D. W. Ohern who then conveyed his interest to Income Shares Corporation. Adobe Royalty is the successor to the interest of Income Shares.

The Fisks were unable to make their note payments or pay real estate taxes for the years 1930 through 1935. As a result, Phoenix filed an action to foreclose its mortgage on September 22, 1936. The Fisks, Harold F. Young, Cora Young, D. W. Ohern, Income Shares Corporation and others of no concern to this action were made party defendants. Personal service of summons was obtained on all the individual defendants except Effie I. Fisk, Harold F. Young, Cora Young, his wife, and D. W. Ohern and _____ Ohern, his wife, all of whom were declared "not found in said County," by the Edwards County Sheriff.

Phoenix filed an affidavit and obtained constructive service by publication upon the unknown heirs of Vivian Fisk and upon Effie I. Fisk, Harold F. Young and Cora Young, and D. W. Ohern and _____ Ohern, as nonresidents of Kansas. The district court approved the service of process.

The Journal Entry of Foreclosure was entered January 5, 1937. The district court found "all of the mineral interests outstanding against the real estate described in the petition were all junior and inferior to the mortgage of plaintiff Phoenix." The court ordered the sheriff to offer the real estate for sale subject to the rights of Income Shares in the minerals. In the event the real estate did not bring a sufficient sum to satisfy Phoenix's judgment, together with interest, taxes and costs, the real estate and severed mineral rights were then to be offered for sale, free and clear of the rights of Income Shares. The real estate was first offered accordingly but no bids were received. The land was then offered for sale with the minerals and sold to Phoenix. The sale was confirmed by the trial court. The appellee in this case,

successor in interest to Phoenix, brought this action to quiet his title to the property.

The sole issue in this case is whether notice by publication in 1936 fulfills the Youngs' and their successors' due process rights where their out-of-state address was known to Phoenix from the beginning of the 1936 foreclosure action. Income Shares Corporation, as predecessor of Adobe Royalty, Inc., filed an answer and cross-petition in the 1936 foreclosure action, thereby entering its appearance and precluding Adobe from successfully asserting this defense.

The appellants argue the notice in this case, which was exclusively by publication, violates their 14th Amendment due process guarantees and renders the 1936 legal proceedings invalid. It has been held that "[l]ack of valid service . . . deprives the court of jurisdiction and the judgment may be attacked at any time." *Dunn v. City of Emporia,* 7 Kan. App. 2d 445, 452, 643 P.2d 1137 (1982). Thus, if the notice was constitutionally defective in this case, the 1936 foreclosure proceedings are void as to the appellants.

In 1956, the United States Supreme Court reversed the Kansas Supreme Court and held unequivocally that notice by publication in a condemnation case was a deprivation of due process when the owner's name and address was known or could be readily ascertained. See *Walker v. Hutchinson City,* 352 U.S. 112, 1 L.Ed.2d 178, 77 S.Ct. 200 (1956). In its decision the *Walker* court noted an earlier United States Supreme Court case in which the due process requirements of notice were articulated.

"An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Central Hanover Tr. Co.,* 339 U.S. 306, 314, 94 L.Ed. 865, 70 S.Ct. 652 (1950).

We later adopted the *Walker* court's decision in *Chapin v. Aylward,* 204 Kan. 448, 464 P.2d 177 (1970), and *Pierce v. Board of County Commissioners,* 200 Kan. 74, 434 P.2d 858 (1967). In *Pierce* the court stated the basic notice requirements of the United States and Kansas Constitutions:

"Where the names and addresses of adverse parties are known or easily ascertainable, notice of pending proceedings by publication service, alone, is not sufficient to satisfy the requirements of due process under the 14th Amendment

to the federal Constitution or § 2 of the Bill of Rights of the Kansas Constitution." 200 Kan. 74, Syl. ¶ 6.

If the 1956 *Walker* decision is applicable to the 1936 mortgage foreclosure, the notice by publication was insufficient since the name and address of Harold F. Young was known to the parties. Phoenix advised the court of the Youngs' address, but since the Youngs were out-of-state residents it requested the court to approve notice by publication. The court approved the notice. The *Walker* court noted the deficiency of notice in such cases when it stated, "It is common knowledge that mere newspaper publication rarely informs a landowner of proceedings against his property." 352 U.S. 116. The *Walker* court further added, "[T]here seem to be no compelling or even persuasive reasons why such direct notice cannot be given. Appellant's name was known to the [appellee] and was on the official records. Even a letter would have apprised him that his property was about to be taken and that he must appear if he wanted to be heard . . . ." 352 U.S. at 116. There is no question if the rule stated in *Walker* is applicable, the Youngs were deprived of due process by the publication notice.

The question remaining is whether the 1956 *Walker* decision is applicable to prior actions. Appellee places great importance on this court's noting in *Pierce* the exact date of the *Walker* decision. In adopting *Walker*, *Pierce* overruled a previous Kansas case in which notice by publication was held not to violate due process. That case, *Phillips Petroleum Co. v. Moore*, 179 Kan. 482, 297 P.2d 183 (1956), was handed down May 5, 1956. The *Walker* case was decided December 10, 1956. The *Pierce* court noted these dates arguably to show that any decisions upholding publication notice prior to the date of the *Walker* decision in December, 1956, were valid. The holding in *Pierce*, however, does not specifically state that as its purpose. We have studiously avoided crossing that threshold heretofore. The issue is presented clearly in the instant case for our resolution.

Constructive notice has been a part of Kansas jurisprudence from the beginning of statehood. The General Laws of Kansas for 1862 provided in pertinent part:

"Service may be made by publication in either of the following cases: In actions brought under the fifty-second and fifty-third sections of this code, where any or all of the defendants reside out of the Territory; in actions brought to establish or set aside a will, where any or all of the defendants reside out of the

Territory; in actions brought against a non-resident of this Territory, or a foreign corporation, having in this Territory property or debts owing to them, sought to be taken by any of the provisional remedies, or to be appropriated in any way; in actions which relate to, or the subject of which is real or personal property in this Territory, where any defendant has or claims a lien or interest, actual or contingent, therein, or the relief demanded consists wholly or partly in excluding him from any interest therein, and such defendant is a non-resident of the Territory, or a foreign corporation; and, in all actions where the defendant, being a resident of the Territory, has departed therefrom, or from the county of his residence, with intent to delay or defraud his creditors, or to avoid the service of a summons, or keeps himself concealed therein with the like intent." G.L. 1862, ch. 26, § 78.

In *Wesner v. O'Brien*, 56 Kan. 724, 725-27, 44 Pac. 1090 (1896), this court construed the constructive notice statute. Justice Johnston, speaking for the court, held the district court had the power to award real estate as alimony in a divorce action where notice on the nonresident defendant was by publication. His analysis is a significant representation of the accepted rationale of publication notice at that time. He stated:

"The determination of the question depends to a great extent upon the statutes of the state, and that the state has full power through its legislature and courts to regulate and control the *status* of its citizens, and to dispose of or control real property to whomsoever it may belong within its limits, will hardly be denied. It is provided that service may be made by publication 'in actions to obtain a divorce, where the defendant resides out of the state . . . . .'

" 'Kansas is supreme except so far as its powers and authority are limited by the constitution and laws of the United States. And within the constitution and laws of the United States the courts of Kansas may have all the jurisdiction over all persons and things within the state which the constitution and laws of Kansas may give to them, and the mode of obtaining this jurisdiction may be prescribed wholly, entirely and exclusively by the statutes of Kansas. To obtain jurisdiction of anything within the state of Kansas, the statutes of Kansas may make service by publication as good as any other kind of service.' [Quoting *Dillon v. Heller*, 39 Kan. 599, 18 Pac. 693 (1888).]

"The same view has been expressed by the supreme court of the United States, where it is said:

'The state through its tribunals may subject property situated within its limits owned by non-residents to the payment of the demand of its own citizens against them, and the exercise of this jurisdiction in no respect infringes upon the sovereignty of the state where the owners are domiciled. Every state owes protection to its own citizens, and when non-residents deal with them it is a legitimate and just exercise of authority to hold and appropriate any property owned by such non-residents to satisfy the claims of its citizens.' (*Pennoyer v. Neff*, 95 U.S. 714).

"In the exercise of this power, lands of non-resident owners are appropriated for the taxes assessed against them upon a publication notice only, mortgage and mechanics' liens are foreclosed against non-resident defendants where there is

neither personal service nor appearance, and the property of non-resident defendants lying within the territorial jurisdiction of the court is subjected to the payment of claims and demands in a variety of ways without other service than by publication."

The law concerning constructive notice in 1936 was G.S. 1935, 60-2525, which provided in pertinent part:

"Service may be made by publication  .  .  .

.  .  .  .

"In actions brought against a non-resident of the state or a foreign corporation having in this state property or debts owing to him sought to be taken by any of the provisional remedies or to be appropriated in any way."

It should be noted that from 1862 to 1964 Kansas provided for out-of-state personal service of summons as an option to publication notice. A choice of one form of service, over the other, however, was not required merely because the nonresident's place of residence was known. In spite of the personal service option, publication notice was authorized for all nonresidents and received wide use with court approval. During the same period of history there was no statutory authority for service by mail on either residents or nonresidents. It is therefore logical to believe the legislature had grave doubts about the effectiveness of obtaining out-of-state personal service because of the reluctance of foreign officers to either make service on a citizen of their territory or to make return of process. Thus, publication notice was deemed the only effective method available to the courts to process actions involving nonresidents. Kansas constructive notice laws were later changed in order to comply with *Walker*.

While public policy is ordinarily declared by the legislature, it is sometimes necessary for the courts to define public policy by construing the Constitution and statutes under the rule of stare decisis. Occasionally, however, changing public policy requires the courts to reverse a prior judicial decision. A court decision interpreting the Constitution or construing a statute ordinarily applies from the date of the adoption of the constitutional provision or from enactment of the statute. Such a rule of construction becomes more and more difficult to apply as the nation grows older. Retroactive application of a change of interpretation of the Constitution affects an untold number of persons and constitutional rights. This difficulty is apparent from the constitutional history of the past thirty years, commencing in 1954 with *Brown*

*v. Board of Education,* 347 U.S. 483, 98 L.Ed. 873, 74 S.Ct. 686 (1954), which overruled *Plessy v. Ferguson,* 163 U.S. 537, 41 L.Ed. 256, 16 S.Ct. 1138 (1896), thereby making separate but equal educational facilities unconstitutional. Because of the revolutionary impact of this dramatic change in the Constitution, the United States Supreme Court not only restricted the application of the change to apply prospectively but even proposed the application to some future date requiring constitutional compliance to be accomplished at "all due speed."

Next came the reapportionment cases, *Whitcomb v. Chavis,* 403 U.S. 124, 29 L.Ed.2d 363, 91 S.Ct. 1858 (1971), *Reynolds v. Sims,* 377 U.S. 533, 12 L.Ed.2d 506, 84 S.Ct. 1362 (1964), and *Baker v. Carr,* 369 U.S. 186, 7 L.Ed.2d 663, 82 S.Ct. 691 (1962). These decisions also applied prospectively. To do otherwise would have nullified all the laws passed by a legislature or Congress, composed of members elected from malapportioned districts.

The human rights cases followed. *Miranda v. Arizona,* 384 U.S. 436, 16 L.Ed.2d 694, 86 S.Ct. 1602 (1966), *Gideon v. Wainwright,* 372 U.S. 335, 9 L.Ed.2d 799, 83 S.Ct. 792 (1963), and *Mapp v. Ohio,* 367 U.S. 643, 6 L.Ed.2d 1081, 81 S.Ct. 1684, *reh. denied* 368 U.S. 871 (1961), are illustrative. Each reversed previous interpretations of the Constitution as to the meaning of due process. See also *Benton v. Maryland,* 395 U.S. 784, 23 L.Ed.2d 707, 89 S.Ct. 2056 (1969), *Pointer v. Texas,* 380 U.S. 400, 13 L.Ed.2d 923, 85 S.Ct. 1065 (1965), and *Malloy v. Hogan,* 378 U.S. 1, 12 L.Ed.2d 653, 84 S.Ct. 1489 (1964). The Supreme Court ruled in each instance the decision should apply prospectively. To have ruled otherwise would have required that virtually every person incarcerated under previous law would have been entitled to a new trial.

In other actions the United States Supreme Court has articulated the problems which can occur from retrospective application of a judicial decision. In *Cipriano v. City of Houma,* 395 U.S. 701, 706, 23 L.Ed.2d 647, 89 S.Ct. 1897 (1969), the U.S. Supreme Court held a Louisiana statute unconstitutional which limited voters on issuance of municipal utility revenue bonds to property taxpayers. The court gave its decision only prospective effect, stating:

"Significant hardships would be imposed on cities, bondholders, and others

connected with municipal utilities if our decision today were given full retroactive effect. Where a decision of this Court could produce substantial inequitable results if applied retroactively, there is ample basis in our cases for avoiding the 'injustice or hardship' by a holding of nonretroactivity. [Citations omitted.] Therefore, we will apply our decision in this case prospectively."

In *Phoenix v. Kolodziejski*, 399 U.S. 204, 26 L.Ed.2d 523, 90 S.Ct. 1990 (1970), the U.S. Supreme Court held an Arizona statute unconstitutional which restricted voters on general obligation bonds to property owners. Again the court gave its decision no retroactive effect because the decision would be unjustifiably disruptive if applied other than in a prospective manner.

We can see from these cases if the hardship and disruption caused by a retrospective application of a court decision changing public policy is significant, the U.S. Supreme Court has had no hesitation in applying the decision prospectively only.

Kansas cases have also discussed the hardships and problems which occur when courts change decisions retrospectively. In *Harvest Queen Mill & Elevator Co. v. Sanders*, 189 Kan. 536, 543, 370 P.2d 419 (1962), cited by the court below, we upheld the long-established rule that railroad rights-of-way across property did not create a fee simple title entitling the railroad to the mineral rights below the right-of-way, but rather created only an easement, without any mineral rights. In so doing we stated:

"Where questions arise which affect titles to land, it is of great importance to the public that when they are once decided they should no longer be considered doubtful. Such decisions become rules of property, and many titles may be injuriously affected by their change. Legislatures may alter or change their laws, without injury, as they affect the future only, but where courts vacillate and overrule their own decisions on the construction of statutes affecting the title to real property, their decisions are retrospective and may affect titles purchased on the faith of their stability. Doubtful questions on subjects of this nature, when once decided, should be considered no longer doubtful or subject to change."

The trial court also cites as authority for its proposition that *Walker* should not be applied retroactively a Kansas case in which governmental immunity was reduced. In that case, *Carroll v. Kittle*, 203 Kan. 841, 851, 457 P.2d 21 (1969), we stated:

"We find ample authority for the proposition that in departing from the rule of *stare decisis*, the court may restrict application of a newly established rule to the instant case, and cases arising in the future, where it is clear that the retrospective application of the new rule will result in a hardship to those who have relied upon prior decisions of the court."

Despite the reasons cited for prospective application of decisions which cause great hardships when applied retroactively, the appellant argues *Walker* should be applied retroactively in this case. In support the appellant cites several cases from other jurisdictions, as well as United States Supreme Court cases, which have applied *Walker* to situations in which the landowner discovered after *Walker* that their land had been taken without actual notice due to notice by publication prior to *Walker*. See *Schroeder v. City of New York*, 371 U.S. 208, 9 L.Ed.2d 255, 83 S.Ct. 279 (1962); *New York v. N.Y., N.H. & H.R. Co.*, 344 U.S. 293, 97 L.Ed. 333, 73 S.Ct. 299 (1953); *City of Tucson v. Melnykovich*, 10 Ariz. App. 145, 457 P.2d 307 (1969); *United States v. Chatham*, 323 F.2d 95 (4th Cir. 1963); *Town of Newcastle v. Toomey*, 78 Wyo. 432, 329 P.2d 264 (1958). These cases, however, fail to discuss the implications of the retroactive application of *Walker*. It is essential to weigh the effect of retroactive application of a decision due to the broad impact of retroactivity on previously decided cases.

In *Vaughn v. Murray*, 214 Kan. 456, 521 P.2d 262 (1974), Justice Fromme stressed the need to weigh the effect of retroactive application of judicial decisions in the context of the guest statute, which was overruled in *Henry v. Bauder*, 213 Kan. 751, 518 P.2d 362 (1974).

In *Vaughn*, the court allowed limited retroactive application of *Henry* since the court believed "some limitation is necessary because of benefits which flow from giving finality to cases fairly heard and determined. There is trauma and expense to litigants in every trial. The trauma and expense is doubled by requiring a second trial." 214 Kan. at 466.

Giving the *Walker* decision retroactive application produces significant ramifications. The publication notice method of serving summons on nonresident defendants in all in rem actions plus will contests and divorce actions was quite frequently used prior to *Walker*. Not only was it authorized by statute, it was easy, sure and made the answer date certain. As a result of its wide use for ninety-four years, such publication notice affects most Kansas real estate titles. It is the exception rather than the rule for a real estate title not to have a mortgage foreclosure, tax foreclosure, quiet title, partition, will contest or divorce with publication notice in its chain of ownership. Thus, it is apparent

the voiding of publication notice on nonresident defendants whose residences were known or ascertainable, would cloud the title to an untold amount of real estate. Such action would force a re-examination of the title to all Kansas real estate and subject title insurance companies to unforeseen liability. In addition, divorces granted on publication notice would be void, nullifying many second marriages and rendering the children born to such unions illegitimate.

Due to the obvious substantial hardships and disruption which would be caused by retroactive application of the rule in *Walker* we conclude it applies prospectively only from December 10, 1956.

The judgment of the trial court is affirmed.