925 P.2d 1184

**BOGLE FARMS, INC., et al.,
Plaintiffs–Appellees,**

v.

**Jim BACA, Commissioner of Public Lands for the State of New Mexico, Defendant–Appellant.**

No. 21,259.

Supreme Court of New Mexico.

Sept. 9, 1996.

Tom Udall, Attorney General, Bridget A. Jacober, Louhannah M. Walker, Christopher G. Schatzman, Special Assistant Attorneys General, Santa Fe, for Appellant.

Jones, Snead, Wertheim, Wentworth & Jaramillo, P.A., Jerry Wertheim, James G. Whitley, Carol A. Clifford, Santa Fe, for Appellees.

Jennings Law Firm, A.D. Jones, Roswell, for Amicus Curiae N.M. Public Lands Council, Inc.

Hinkle, Cox, Eaton, Coffield & Hensley, P.L.L.C., Gregory J. Nibert, Roswell, for Amicus Curiae signatory N.M. title attorneys.

## OPINION

RANSOM, Justice.

1. The Commissioner of Public Lands appeals from a partial summary judgment in favor of twenty-six plaintiffs who seek a declaratory judgment that their installment contracts for the purchase of state trust lands do not reserve sand and gravel to the state. The trial court ruled that the Commissioner is collaterally estopped from arguing that the general mineral reservations included within the contracts effectively reserved sand and gravel rights to the state. The court certified this as a proper case for interlocutory appeal under NMSA 1978, Section 39-3-4(A) (Repl.Pamp.1991). We accepted jurisdiction over the appeal pursuant to SCRA 1986, 12-203 (Repl. Pamp.1992). The collateral estoppel issue arises from *Roe v. State ex rel. State Highway Department,* 103 N.M. 517, 521, 710 P.2d 84, 88 (1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), in which this Court ruled that because a purchase contract and a patent did not specifically reserve sand and gravel to the state, title to these items passed to the purchaser along with the surface estate.

2. In a prior opinion filed in this case on August 15, 1995, a majority of this Court concluded that *Roe* does not collaterally estop the Commissioner from litigating wheth-

er sand and gravel are minerals within the meaning of the general mineral reservations in question. On motion for rehearing, Plaintiffs urged us to conclude that *Roe* established a rule of property and to affirm the trial court under principles of stare decisis, notwithstanding the inapplicability of the collateral-estoppel doctrine. We withdrew our prior opinion and directed the Commissioner to respond to Plaintiffs' rule-of-property argument. Hinkle, Cox, Eaton, Coffield and Hensley, P.L.L.C., filed an amicus curiae brief on behalf of New Mexico title attorneys. The case was reargued before the full Court. We reverse and remand with instructions.

3. *Facts and proceedings.* Plaintiffs are original purchasers of or successors in interest to land sold by the Commissioner of Public Lands pursuant to installment contracts executed in the early 1960s. Each original purchaser, prior to entering into an installment contract, signed under oath an application for purchase which recited that "this application is not made for the purpose of obtaining title to mineral, including but not limited to ... sand and gravel ... but with the sole object of obtaining title to the surface of the land."

4. Several of the plaintiffs have fulfilled their contractual payment obligations and received patents from the Commissioner transferring legal title. In these patents the Commissioner included a specific reservation of sand and gravel rights. One of the plaintiffs, Joe Helm, complained that the purchase contract had not included a specific reservation of sand and gravel and requested that the Commissioner delete from his patent all specific reservations that had not been expressly stated in the purchase contract. The Commissioner refused.

5. Plaintiffs brought this action against the Commissioner, claiming that sand and gravel were not within the general mineral reservation of their purchase contracts and seeking a declaratory judgment that their patents should not include a specific reservation of sand and gravel. Those plaintiffs who had fulfilled their payment obligations and received patents containing the specific reservation asked the trial court to order the Commissioner to issue new patents that do not contain this reservation. Those plaintiffs who were still making payments asked the court to order the Commissioner, upon receipt of full payment, to issue patents not containing the specific reservation.

6. Plaintiffs moved for partial summary judgment, asking the trial court to determine that the general mineral reservation in the purchase contract did not include sand and gravel. Plaintiffs based their request on the doctrine of equitable conversion, arguing that the purchase contracts gave them equitable title to all property interests not specifically reserved, and thus, upon full execution of the purchase contract, each was entitled to a patent conveying legal title to such property interests. Plaintiffs alternatively based their request on the doctrine of offensive collateral estoppel, contending that the Commissioner had a full and fair opportunity to argue the mineral reservation issue in *Roe*.

7. The trial court entered partial summary judgment, determining that the Commissioner was "collaterally estopped under [*Roe* ] from litigating whether sand and gravel are minerals, as that term is used in purchase contracts for state lands," but also determining that the Commissioner was free to pursue all issues regarding his counterclaims and affirmative defenses.[1] In its order the court expressly stated that the collateral estoppel issue involved "a controlling question of law as to which there is a substantial ground for difference of opinion and that an immediate appeal from this decision or order may materially advance the ultimate termination of the litigation." This Court has addressed many times the question whether sand and gravel fall within a general mineral reservation in a state land purchase contract. Our opinions have been inconsistent, leaving room for debate on this issue. We consequently agreed with the trial court's assessment and granted the Commissioner's

---

1. In his answer to the complaint the Commissioner asserted counterclaims for rescission based on mutual mistake, fraud, lack of capacity, and failure of consideration, and for reformation and damages. He also asserted the affirmative defenses of estoppel, acquiescence, laches, capacity, want of consideration, waiver, merger, and acceptance.

application for interlocutory appeal of the collateral estoppel issue.

8. *Partial summary judgment as an effective case-management tool.* The Commissioner argues that partial summary judgment was improper because the trial court did not consider his counterclaims and affirmative defenses; but, here, partial summary judgment was an effective case-management tool because it allowed the court to define the course of litigation. A primary issue in this case is whether this Court's holding in *Roe* is entitled to collateral estoppel effect. If *Roe* is entitled to collateral estoppel effect, the Commissioner cannot rely on evidence outside the purchase contract's general mineral reservation to resolve a purported ambiguity in favor of a reservation of sand and gravel. "For the State to reserve sand and gravel, a provision so specifying must be included in [the purchase contract]." *Roe*, 103 N.M. at 521, 710 P.2d at 88. Alternatively, if there is no collateral estoppel, the Commissioner may litigate the meaning of the term "mineral" in each individual contract, and, if he were to prevail, the trial court would not reach the Commissioner's counterclaims or affirmative defenses. Under either scenario, substantial litigation may be avoided through the entry of partial summary judgment.

9. *History of sand and gravel litigation in New Mexico.* When New Mexico attained statehood, the federal government transferred to the state government control over vast areas of land. This land was to be held in trust for schools and other public institutions. *See* Act of June 20, 1910, ch. 310, § 10, 36 Stat. 557, 563 (Enabling Act). The state has authority to dispose of this trust land "in whole or in part" as long as it uses the value received therefor in a manner consistent with the Enabling Act. Operating under this authority, the Commissioner entered into several installment purchase contracts, some of which are the subject of this dispute.

10. By the time the Commissioner entered into the disputed contracts, the New Mexico State Land Office had promulgated rules governing the sale of state trust lands. Under these rules the state is required to reserve rights to "[a]ll minerals of whatsoev-

er kind, including oil, gas, *commercial sand, gravel* and caliche." General Information & Rules & Regulations: Rules Relating to State Land Sales, N.M. State Land Office, Rule 2 (Jan. 22, 1965) (emphasis added). The Commissioner contends that the definition of "mineral" in this rule reflects the law in effect at the time the disputed contracts were executed and that this law governs the meaning of the general mineral reservation, relying in part on *Board of County Commissioners v. Good*, 44 N.M. 495, 105 P.2d 470 (1940). In *Good* this Court considered the appropriate measure of damages in an inverse condemnation proceeding when the state has entered land and removed caliche. In determining that the trial court should have received and considered evidence of the value of the caliche taken based upon all uses to which it could be put, we stated that sand, gravel, ordinary clay, and caliche fall within the term "mineral." *Id.* at 498, 105 P.2d at 472.

11. The Commissioner also cites three Attorney General opinions in which the Attorney General's Office stated its position that sand and gravel were "minerals" within the common meaning of that term. *See* N.M.Att'y Gen.Op. 61–12 (1961) (stating that sand and gravel were minerals as that term was used in a general reservation clause contained in a "Grant of Material Site" issued to state highway department); N.M.Att'y Gen.Op. 5568 (1952) (stating that the State Inspector of Mines has jurisdiction over sand and gravel pits because sand and gravel are minerals and the inspector has jurisdiction over all mineral mining); N.M.Att'y Gen.Op. 4816 (1945) (noting that a majority of cases had determined that sand and gravel are minerals and opining that sand and gravel were included in general mineral reservations found in state land purchase contracts). However, Attorney General opinions do not bind this Court, and in one of the opinions cited by the Commissioner—No. 4816—the Attorney General's Office recommended filing a declaratory judgment action to definitively resolve whether sand and gravel were minerals.

12. This Court specifically addressed whether the term "mineral" as used in a

reservation included sand and gravel for the first time in *State ex rel. State Highway Commission v. Trujillo*, 82 N.M. 694, 487 P.2d 122 (1971), *overruled by Champlin Petroleum Co. v. Lyman*, 103 N.M. 407, 410, 708 P.2d 319, 322 (1985). Basing our holding on a review of the Federal Stock–Raising Homestead Act, 43 U.S.C. §§ 291–302 (1982) (repealed in part in 1976), we concluded that the federal government did not intend to include sand and gravel within the term "mineral" as it was used in a federal patent. *Trujillo*, 82 N.M. at 696–97, 487 P.2d at 124–25. The United States Supreme Court indirectly overruled this conclusion in *Watt v. Western Nuclear, Inc.*, 462 U.S. 36, 55, 103 S.Ct. 2218, 2229, 76 L.Ed.2d 400 (1983) (determining that gravel was included within the scope of the mineral reservation contained in a federal patent issued under the Stock–Raising Homestead Act). Relying on *Watt*, this Court expressly overruled *Trujillo* in *Champlin Petroleum Co.*, wherein we determined that caliche was "a mineral similar to sand, gravel, clay, and limestone," *Champlin Petroleum Co.*, 103 N.M. at 409, 708 P.2d at 321, and was therefore included within the general mineral reservation of a federal patent, *id.* at 410, 708 P.2d at 322.

13. In 1975 this Court first addressed whether an owner of land purchased from the state pursuant to contract was entitled to inverse condemnation damages after the State Highway Department entered the land and removed sand and gravel. *Burris v. State ex rel. State Highway Comm'n*, 88 N.M. 146, 538 P.2d 418 (1975), *overruled in part by Roe*, 103 N.M. at 521, 710 P.2d at 88. The purchase contract at issue in *Burris* did not include a specific reservation of sand and gravel. An application for purchase, however, contained a statement in which the applicant swore that he did not intend to purchase sand and gravel [2], and the patent issued by the state contained a reservation of "all minerals of whatsoever kind." *Id.* at 147, 538 P.2d at 419. Based on these documents and other relevant evidence, this Court determined that the parties intended to include sand and gravel within the general mineral

reservation of the purchase contract. *Id.* at 147–48, 538 P.2d at 419–20.

14. In reaching its decision, the *Burris* Court held that whether sand and gravel are minerals "is to be resolved according to the applicable statutes and the facts of each case." *Id.* at 147, 538 P.2d at 419. In essence, the Court determined that whether the term "mineral" includes sand and gravel is an inherently factual question to be decided on a case-by-case basis by ascertaining the intent of the parties. The Court distinguished its earlier decision in *Trujillo* wherein the parties had not provided evidence showing an intent to include sand and gravel within the general reservation of the federal patent. *Id.* Because the parties in *Burris* had provided such evidence, we held that the term "mineral" included sand and gravel.

15. After *Burris* this Court decided *Rickelton v. Universal Constructors, Inc.*, 91 N.M. 479, 576 P.2d 285 (1978), in which a landowner brought suit to cancel certain sand and gravel leases entered into between the state and a contractor. *Id.* at 479, 576 P.2d at 285. In *Rickelton* the record did not contain evidence that the owner had signed an application for purchase containing a disclaimer of sand and gravel rights. *See id.* at 480–81, 576 P.2d at 286–87. The Court reiterated the rule that "[w]hether sand and gravel are 'minerals' as that term is used in a mineral reservation or grant depends upon the specific facts in each case" and determined that, under the facts before it, the parties did not intend to include sand and gravel in the definition of "minerals." *Id.* at 481, 576 P.2d at 287.

16. In *Jensen v. State Highway Commission*, 97 N.M. 630, 642 P.2d 1089, *cert. denied*, 459 U.S. 838, 103 S.Ct. 86, 74 L.Ed.2d 80 (1982), the Court revisited the issue whether an owner could recover inverse condemnation damages after the State Highway Commission entered the land and removed sand and gravel. Relying on *Trujillo* and *Rickelton*, the Court determined that, absent a specific reservation to the contrary, sand and gravel were not "minerals" as that term was used in general mineral reservations

---

2. The language in the purchase contract and in the application for purchase in *Burris* is identical to the language in the purchase contracts and the original applications for purchase in this case.

contained in purchase contracts. *Id.* at 631, 642 P.2d at 1090. Because the plaintiff's purchase contract did not contain a specific reservation, the Court held that the parties did not intend to include sand and gravel within the definition of "mineral." *Id.*

17. Finally, in *Roe*, 103 N.M. at 518, 710 P.2d at 85, this Court decided the issue "whether the gravel on the subject property belongs to the surface estate owner or was reserved to the [state] under a general mineral reservation contained in the contract of purchase and the patent for the property." The plaintiff was a successor in interest to a patent issued after a purchase contract for state lands had been paid in full. Although as in *Burris* the original purchaser had signed an application stating that he did not intend to buy sand and gravel rights, neither the purchase contract nor the patent contained anything more than a general reservation of mineral rights. Relying on *Jensen,* the Court determined that the language of the purchase contract or patent should control because "[a]n application is merely a request to purchase, and its provisions do not affect ... title." *Id.* at 521, 710 P.2d at 88. "The title that passes is determined by the conveyances themselves, the purchase contract and the patent." *Id.* Because neither the purchase contract nor the patent contained a specific reservation of sand and gravel, the Court reversed summary judgment in favor of the State. *Id.*

■ 18. *Collateral estoppel does not apply.* Here, the trial court ruled that, because the Commissioner had unsuccessfully litigated the issue in *Roe,* he is collaterally estopped from arguing that sand and gravel are "minerals" as that term is used in state land contracts. In deciding whether the Commissioner is collaterally estopped from litigating the mineral reservation issue against Plaintiffs, it is irrelevant that Plaintiffs were not privy to the *Roe* litigation. *See Silva v. State,* 106 N.M. 472, 476, 745 P.2d 380, 384 (1987). We first must determine whether *Roe* "actually and necessarily decided" the mineral reservation issue. *Id.* at 474, 745 P.2d at 382. If it did, we then consider whether there are countervailing equities

that preclude the application of collateral estoppel. *Id.*

19. —*What Roe actually and necessarily decided.* *Roe* was an inverse condemnation action and, like the instant appeal, it involved the question whether a land sales contract with a general mineral reservation clause had transferred sand and gravel rights to the purchasers. The procedural posture of *Roe* was, however, quite distinct from this appeal. There, relying on *Watt,* 462 U.S. at 56, 103 S.Ct. at 2229, in which the United States Supreme Court held that sand and gravel were included within a general mineral reservation in a federally-issued patent, the trial court granted the state summary judgment. *Roe,* 103 N.M. at 519, 710 P.2d at 86. In reversing summary judgment, the *Roe* Court concluded that the trial court erroneously had applied federal law. *Id.* The Court also determined that a general reservation clause and a land purchase application are, without more, insufficient to show that the state has reserved sand and gravel. *Id.* at 521, 710 P.2d at 88.

20. Because the *Roe* Court had before it an appeal from summary judgment, it was necessary to determine only whether a question of fact existed regarding the State's reservation of sand and gravel in that case. There was no need to determine whether the State might ever reserve sand and gravel without an express reservation. Nonetheless, the *Roe* Court stated flatly, "For the State to reserve sand and gravel, a provision so specifying must be included in these conveyances." *Id.* With this broad language, the *Roe* Court may have been attempting to resolve the ambiguity once and for all and to put to rest an issue that had given rise to a great deal of litigation. Perhaps it was suggesting that a general reservation clause cannot be shown to be ambiguous. We will assume for purposes of this appeal that *Roe* necessarily held that sand and gravel are not reserved unless there is a specific reservation. The question then is whether countervailing equities militate against the application of collateral estoppel.

21. —*Fact-specific nature of necessary inquiry.* As demonstrated by the foregoing history of sand and gravel litigation in New

Mexico, the question often has arisen whether the term "mineral" includes sand and gravel. Generally, we have resolved this issue on a case-by-case basis. We established this principle in *Burris, see* 88 N.M. at 147, 538 P.2d at 419, and restated the principle in *Rickelton, see* 91 N.M. at 481, 576 P.2d at 287. After *Rickelton* this Court did not expressly restate the rule, but in both *Jensen* and *Roe* we framed the issue to be decided in terms of the particular facts of the case. *See Jensen,* 97 N.M. at 631, 642 P.2d at 1090 (framing the issue as "[w]hether sand and gravel are minerals within a reservation of minerals to the State *contained in the purchase contract between Jensen and the State*" (emphasis added)); *Roe,* 103 N.M. at 518, 710 P.2d at 85 (framing the issue as "whether the gravel *on the subject property* belongs to the surface estate owner ... under a general mineral reservation contained in the contract of purchase and the patent for the property" (emphasis added)).

22. The case-by-case rule adopted in *Burris* is based on the principle that in contract cases the role of the court is to give effect to the intention of the contracting parties. The role of the court is to determine whether the parties intended to include sand and gravel within the term "mineral." *E.g., Jensen,* 97 N.M. at 631, 642 P.2d at 1090 (holding that state did not intend to reserve sand and gravel because it did not do so by specific reservation in purchase contract); *Burris,* 88 N.M. at 147, 538 P.2d at 419 ("[T]he issue is whether the parties intended that sand and gravel are, or are not, to be ... classified [as minerals]."). "The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument." *Shaeffer v. Kelton,* 95 N.M. 182, 185, 619 P.2d 1226, 1229 (1980). The determination whether sand and gravel are included within a general mineral reservation must be done on a case-by-case basis because the intent of parties to one contract may not be the same as the intent of parties to another contract. Thus, the fact-specific nature of the necessary inquiry militates against giving collateral-estoppel effect to *Roe.*

23. —*Involvement of state trust lands is a countervailing equity.* Also militating against the applicability of collateral estoppel in this case is the great public importance of state trust lands. In *United States v. Mendoza,* 464 U.S. 154, 162, 104 S.Ct. 568, 573, 78 L.Ed.2d 379 (1984), the Supreme Court held that collateral estoppel should not be applied to preclude the U.S. government from litigating the constitutionality of a decision to withdraw a naturalization examiner from the Philippines in 1945. The Court reasoned that the development of important questions of law in areas involving public policy should not be stifled by freezing as final the first decision on a particular issue. Of particular importance to the Court was the fact that different administrations make differing policy choices. The Court stated:

> The conduct of Government litigation in the courts of the United States is sufficiently different from the conduct of private civil litigation in those courts so that what might otherwise be economy interests underlying a broad application of collateral estoppel are outweighed by the constraints which peculiarly affect the Government.

*Id.* at 162–63, 104 S.Ct. at 573–74.

24. Prior to *Mendoza* the Supreme Court had applied similar principles in holding that equitable doctrines such as laches and acquiescence would not preclude the federal government from claiming ownership of the ocean basin in a dispute with the state of California over offshore drilling rights. *United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947). The Court reasoned: "The Government, which holds its interests here as elsewhere in trust for all the people, is not to be deprived of those interests by the ordinary court rules designed particularly for private disputes over individually owned pieces of property. ..." *Id.* Thus, following *Mendoza* and *United States v. California,* federal district courts must weigh public policy considerations before applying against the federal government equitable doctrines such as nonmutual collateral estoppel. *See Colorado Springs Prod. Credit Ass'n v. Farm Credit*

*Admin.,* 666 F.Supp. 1475, 1477–78 (D.Colo. 1987) (agreeing that *Mendoza* requires consideration of public policy issues before imposing collateral estoppel against government).

25. A number of state courts also have noted "a sound judicial policy against applying collateral estoppel in cases which concern matters of important public interest." *Chern v. Bank of America,* 15 Cal.3d 866, 127 Cal. Rptr. 110, 113, 544 P.2d 1310, 1313 (1976); *see also White v. Adler,* 289 N.Y. 34, 43 N.E.2d 798 (1942). Hence, in *City of Berkeley v. Superior Court of Alameda County,* 26 Cal.3d 515, 162 Cal.Rptr. 327, 329 n. 5, 606 P.2d 362, 364 n. 5, *cert. denied,* 449 U.S. 840, 101 S.Ct. 119, 66 L.Ed.2d 48 (1980), the California Supreme Court ruled that the state, which upon attaining statehood had succeeded to title in all tidelands within its borders as trustee for the public, was not estopped from arguing that private parties who had been granted title to certain tidelands held such title subject to the public trust. Likewise, in *City of Plainfield v. Public Service Electric & Gas Co.,* 82 N.J. 245, 412 A.2d 759, 766 (1980), the New Jersey Supreme Court held that the doctrine of collateral estoppel would not bar relitigation of the validity of a contract which required a utility to provide electricity to municipal buildings without charge. Because a New Jersey statute prohibited "unjustly discriminatory utility rates and unreasonable preferences," and because the earlier decision had "a potential adverse impact upon the public interest," the court reasoned that the issue, which involved only a question of law, should be reconsidered. *Id.* And finally, in *Edwards v. Board of County Commissioners,* 119 N.M. 114, 116, 888 P.2d 996, 998 (Ct.App. 1994), our Court of Appeals upheld a trial court ruling that precluded the application of collateral estoppel and allowed Bernalillo County to relitigate the validity of a zoning ordinance. *See generally* Restatement (Second) of Judgments § 28(5)(a) (1982) (stating that relitigation of an issue is not precluded when a new determination is needed "because of the potential adverse impact of the determination on the public interest").

26. Here, there is a strong public interest in the protection of state land and its products, as reflected in the Enabling Act's requirement that "no sale or other disposal [of state land or its natural productions] shall be made for a consideration less than the [appraised true] value." Act of June 20, 1910, ch. 310, § 10, 36 Stat. 557, 564. The State has a nondelegable duty to hold as trustee state lands and their products—as well as the proceeds from the sale of state lands and their products—for the development of state schools and other public institutions. *See* N.M. Const. art. XXIV, § 1 (providing that leases and land sales contracts may reserve royalties to the state "as may be provided by act of the legislature"). The Commissioner has presented some evidence that if sand and gravel are not included within general mineral reservations, certain properties have been sold for less than their appraised value in violation of the trust and public policy. Because such strong public interests are at issue, the need to reexamine this question outweighs the interests of judicial economy embodied in the collateral estoppel doctrine. Therefore, the Commissioner's arguments that sand and gravel are included within the general mineral reservations at issue here are not barred by the doctrine of collateral estoppel.

27. *Rules of property.—Stare decisis.* In the motion for rehearing Plaintiffs argue that, notwithstanding the inapplicability of collateral estoppel, the specific-reservation requirement adopted in *Roe* should be given stare decisis effect to avoid creating title uncertainty. In *Duncan v. Brown,* 18 N.M. 579, 585–86, 139 P. 140, 141 (1914), this Court stated that judicial decisions affecting title to real estate "should not be disturbed or departed from except for the most cogent reasons." We reiterated this principle in *English v. Sanchez,* 110 N.M. 343, 347, 796 P.2d 236, 240 (1990), and held that "the proper initiative for a departure from [court precedent holding that contracts to convey community real property not joined by both spouses are void and of no effect] lies with the legislature." Relying on *Duncan* and *English,* Plaintiffs argue that *Roe* established the specific-reservation requirement as a

**430**

"rule of property" and that no cogent reasons exist for departing therefrom.

28. The rule-of-property doctrine has ancient roots, *see* 1 James Kent, *Commentaries on American Law* *475–76 (14th ed.1896), and was first recognized by this Court in *Arellano v. Chacon*, 1 N.M. 269 (1859). That case considered whether an appeal lies from a court determination of an election contest. This Court ultimately overruled a previous decision which had allowed such appeals. *Id.* at 272, 278. Writing for the Court, Chief Justice Benedict stated:

> In overruling the decision of this court, ... we are not discouraged in our sense of duty by the reflection that heavy and important interests as to property and persons have grown up, under the protection, and by virtue of that decision, which our present rulings would disturb, embarrass, and destroy. No such interests have arisen. If they had, we would long have hesitated touching the question discussed, let our opinions have been as they may. Circumstances may sometimes exist, when a court should pass previous adjudications as a "sealed book" though they may have been erroneously made at the beginning.

*Id.* at 278–79.

29. The California Supreme Court explained the role of a rule of property in the application of stare decisis in *Abbott v. City of Los Angeles*, 50 Cal.2d 438, 326 P.2d 484, 494–95 (1958) (in bank). There, the City of Los Angeles argued that its decision to switch from variable to fixed pensions for members of its police and fire departments was a rule of property and thus should not be disturbed. The court explained the rule-of-property doctrine thus:

> [D]ecisions long acquiesced in, which constitute rules of property or trade or upon which important rights are based, should not be disturbed, even though a different conclusion might have been reached if the question presented were an open one, inasmuch as uniformity and certainty in rules of property are often more important and desirable than technical correctness. Thus, judicial decisions affecting the business interests of the country should not be disturbed except for the most cogent rea-

sons, as where the evils of the principle laid down will be more injurious to the community than can possibly result from a change, or upon the clearest grounds of error.

*Id.* (quoting 14 Am.Jur. *Courts* § 65, at 286 (1941)); *see also Barrows v. McDermott*, 73 Me. 441, 448–49 (1882) (stating that rule should not be overturned when "it has been so largely accepted and acted upon by the community as law that it would be fraught with mischief to set it aside"). The *Abbott* court ultimately concluded that the city's reliance upon the rule-of-property doctrine was misplaced, reasoning "that defendants have not relied upon any 'long line of cases' in either adopting the charter amendments here under attack, in failing to pay fluctuating rather than fixed pensions to plaintiffs, or in adding to its pension system certain benefits." 326 P.2d at 495.

 30. Insofar as *Roe* pronounced a rule that affects title to real estate, it did adopt a "rule of property." Whether we should adhere to *Roe* as a matter of stare decisis, however, involves more than mere talismanic invocation of a phrase. The especial importance of stare decisis in cases involving a rule of property is twofold. First, and more generally, the anti-majoritarian nature of the judicial system makes adherence to precedent essential to promote public confidence in the law and its administration. *Hart v. Burnett*, 15 Cal. 530, 601 (1860) (noting "the importance of consistency and stability in [court] decisions, and the uneasiness and uncertainty which changes of them produce in the public mind"). Second, and more specific to rules affecting property or commercial transactions, adherence to precedent is necessary to the stability of land titles and commercial transactions entered into in reliance on the settled nature of the law. *Giles v. Adobe Royalty, Inc.*, 235 Kan. 758, 684 P.2d 406, 413 (1984) (declining to give decision retroactive effect because "[s]uch action would force a re-examination of the title to all Kansas real estate"); *Bott v. Commission of Natural Resources of Michigan*, 415 Mich. 45, 327 N.W.2d 838, 849 (1982) (stating that "stare decisis is to be strictly observed where past decisions establish 'rules of prop-

erty' that induce extensive reliance"); *see also City of Las Vegas v. Oman*, 110 N.M. 425, 433, 796 P.2d 1121, 1129 (Ct.App.) (noting the particular force of stare decisis in cases which seek to overturn decisions affecting property rights), *cert. denied*, 110 N.M. 282, 795 P.2d 87 (1990).

31. The crucial inquiry, then, when it is advocated that a proposition must be adhered to as a rule of property, is likewise twofold. First, to what extent has the proposition cited as a rule of property become settled or fixed? As the California Supreme Court explained in *Hart*:

> "The *rule of property*," then, is not necessarily created or shown by the mere decision, or two or three decisions of a Court. It is the settled, fixed, stable principle regulating titles and the estimate of their validity and value in the minds of practical men, who draw their conclusions from judgments which have been commonly acquiesced in as settled law, or the general titles affirmed, by which they have passed beyond contention and dispute.

15 Cal. at 609. Second, we must assess the extent to which a proposition cited as a rule of property has induced persons to enter into transactions in actual or demonstrable reliance thereon.

> Nor is the loose expression *"that rights have vested"* under such decisions, to be construed in the sense supposed, if by this phrase be meant that the vesting of any rights under a judgment—however limited in extent or the number of persons claiming—makes the principle therein asserted irreversible; for probably no judgment such as this is ever without *some* effect on the transfer of property; and therefore, if this were the criterion, *every* judgment affirming a title would be protected.

*Id.* at 609–10; *see also Bott*, 327 N.W.2d at 850 (refusing to reject log-flotation and commercial-shipping tests of navigability in favor of recreational-boating test because the former two tests had been applied "long enough to give rise to a fixed conception of the public's navigational rights" and because "landowners ha[d] invested their savings or wealth in reliance on a long-established definition of navigability").

32. Returning to *City of Berkeley*, in which the California Supreme Court overturned two prior opinions that had held that deeds issued by the California Board of Tide Land Commissioners pursuant to an 1870 legislative act conveyed absolute title to the grantees, 162 Cal.Rptr. at 337–38, 606 P.2d at 372–73 (overruling *Knudson v. Kearney*, 171 Cal. 250, 152 P. 541 (1915) and *Alameda Conservation Ass'n v. City of Alameda*, 264 Cal.App.2d 284, 70 Cal.Rptr. 264 (1968), *cert. denied*, 394 U.S. 906, 89 S.Ct. 1013, 22 L.Ed.2d 217 (1969)), we note there is a public-interest aspect to rejection of stare decisis as well as to the rejection of collateral estoppel. There, the court concluded that "most cogent reasons" existed for overturning the decisions. *Id.* 162 Cal.Rptr. at 337, 606 P.2d at 372. First, the decision would not deprive anyone of title entirely; rather, "some landowners whose predecessors in interest had acquired property under the 1870 act will . . . hold it subject to the public trust." *Id.* Further, the two decisions that were overturned were the only opinions on the issue, "and it was apparent from the face of the *Knudson* opinion that although the public's right to large tracts of tidelands in the Bay was at stake, the state as trustee of those rights was not a party to the action." *Id.* Finally, the court stated that *Knudson* was virtually devoid of reasoning and that both *Knudson* and *Alameda Conservation* were "wholly in error." *Id.* Therefore, the court concluded:

> The consequences of allowing the patently erroneous decisions to stand in the present case would be to deprive the people of the state of full control over many thousand acres of tidelands acquired by them at the time of statehood. In these circumstances, . . . we do not doubt that it would be more injurious to the public interest to perpetuate the error of *Knudson* and *Alameda Conservation* than to overturn those decisions.

*Id.* 162 Cal.Rptr. at 338, 606 P.2d at 373.

33. —*Application of the law to these facts.* *Roe* was decided in 1985, and this suit was initiated in 1992. As we discussed in the history of sand and gravel litigation section of this opinion, prior to *Roe* this Court had

held in *Burris* that a general mineral reservation included sand and gravel. While at the very least, at the time the original purchase contracts were entered into in the 1960s it was unclear whether sand and gravel were included in a general mineral reservation, the original purchasers did sign applications disavowing an intent to obtain sand and gravel rights. More importantly, under a rule-of-property analysis, these original purchasers can hardly claim that they entered into purchase contracts in reliance on *Roe*. As for their successors in interest, we have not been referred to any record evidence indicating the number of contracts which may have been entered into in reliance on the *Roe* specific-reservation requirement. Reliance on *Roe* as a rule of property may be a factual issue with respect to some of the interests in question.

34. The polestar of deed construction is the parties' intent. 6A Richard R. Powell, *Powell on Real Property* ¶ 899[3], at 81A–108 (Patrick J. Rohan ed.1994). In light of this principle, and because title to state trust lands should not be conveyed by implication, *see City of Berkeley*, 162 Cal. Rptr. at 334, 606 P.2d at 369 (stating that "statutes purporting to abandon the public trust are to be strictly construed; the intent to abandon must be clearly expressed or necessarily implied"), we now retreat from the statement in *Roe* which suggests that we will disregard the mutual intent of the contracting parties and instead look for certain required language. If we were to hold that the definition of "minerals" set out in *Roe* applied to all land sales contracts, we would indeed exalt form over substance. The intent of the contracting parties would be abrogated by rule of law in favor of a strict definition. Our legal history, however, favors substance over form, and thus we will not dispense with the intentions of the contracting parties by holding them to a definition that they did not accept. We will not allow parties to a contract to gain something for which they did not bargain and for which they did not pay. Nor will we take away the right of the parties to agree mutually to the meaning of the terms of a contract. Thus, we remand this case for evidentiary proceedings under the following guidelines.

35. Obviously, anyone purchasing land under a purchase contract or a patent with a specific reservation would be bound by the terms of that reservation. If there is not a specific reservation, the trial court must look to evidence outside the face of the contract to determine the meaning intended for the term "mineral" when that term has been shown under the circumstances to be ambiguous. In those cases involving successors in interest to original purchasers, the relevant inquiry will be the extent to which the purchase was made in reliance on *Roe*. Absent such reliance, the issue is whether the parties to the original contract intended that the State reserve sand and gravel. If the original purchaser did not purchase sand and gravel rights from the State, that purchaser could not have conveyed sand and gravel to a subsequent purchaser, regardless of the intent, lack of notice, or good faith of the parties to the later transaction. *See* 7 Powell, *supra*, ¶ 938.21[5], at 84D–31 (stating that assignees may not take more than what assignor possessed). Absent reliance, any effect of *Roe* as a rule of property is hereby overruled.

36. *Conclusion.* Collateral estoppel does not apply to this case because the question whether sand and gravel are "minerals" as that term is used in general mineral reservations is to be answered on a case-by-case basis by examining the intent of the parties and because public policy considerations here militate against application of collateral estoppel offensively against the government. As far as a rule of property, there cannot have been reliance on a long line of settled decisions by the original purchasers. Reliance by successors in interest is a factual issue. The trial court's entry of summary judgment is reversed; we remand for proceedings consistent with this opinion.

37. **IT IS SO ORDERED.**

BACA, C.J., and FRANCHINI and MINZNER, JJ., concur.

McKINNON, J. (specially concurs).

McKINNON, Justice (specially concurring).

I concur in Justice Ransom's well-reasoned opinion and write primarily to emphasize

that the dispute here was between the government and private parties. Because of public policy considerations in its role as trustee for the public lands, the government could not be collaterally estopped by the decision in *Roe v. State ex rel. State Highway Department,* 103 N.M. 517, 710 P.2d 84 (1985), *cert. denied,* 476 U.S. 1141, 106 S.Ct. 2247, 90 L.Ed.2d 693 (1986), to claim an interest in sand and gravel even though the purchase contracts did not expressly reserve these materials. Similarly, the rule of law requiring a specific reservation under *Roe* should not be applicable; instead the intention of the parties should be controlling. However, these public policy considerations are not present in similar disputes between private parties. Thus, for a private grantor to reserve land and gravel, a provision so specifying must continue to be included in the purchase contract.