[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Koprivec v. Rails-to-Trails of Wayne Cty.*, Slip Opinion No. 2018-Ohio-465.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2018-OHIO-465

KOPRIVEC ET AL., APPELLEES AND CROSS-APPELLANTS, *v*. RAILS-TO-TRAILS OF WAYNE COUNTY, APPELLANT AND CROSS-APPELLEE.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Koprivec v. Rails-to-Trails of Wayne Cty.*, Slip Opinion No. 2018-Ohio-465.]

*Real property—Deeds—Adverse possession—Court of appeals' determination that 1882 deed created a fee simple absolute affirmed—In re Petition of Copps Chapel Methodist Episcopal Church disapproved to extent it suggested that a deed can create a determinable fee only by including language explicitly saying that property would revert to grantor upon occurrence of stated event—A title holder's licensee may defeat exclusivity element of an adverse-possession claim if licensee performs acts on the land that would ordinarily require owner's permission—Licenses granted by railroad company that previously owned abandoned rail corridor to two telecommunications companies and associated corridor-maintenance activities failed to defeat exclusivity element of adverse-possession claims*

*Reporter's Note: This cause was decided on January 24, 2018, but was released to the public on February 7, 2018, subsequent to the resignation of Justice William M. O'Neill, who participated in the decision.

*of neighboring landowners—Railroad companies' activities on corridor were insufficient to defeat exclusivity element of two adverse-possession claims but sufficient as to third—Court of appeals' determination that genuine issues of material fact exist and preclude summary judgment as to two adverse-possession claims affirmed, and cause remanded—Court of appeals' determination that genuine issues of material fact exist and preclude summary judgment as to third adverse-possession claim reversed.*

(No. 2016-0704—Submitted May 16, 2017—Decided January 24, 2018.*)

APPEAL and CROSS-APPEAL from the Court of Appeals for Wayne County, No. 15AP0006, 2016-Ohio-1141.

_____

**DEWINE, J.**

**{¶ 1}** This case involves a dispute about ownership of an abandoned rail corridor. It pits a nonprofit organization, Rails-to-Trails of Wayne County ("Rails-to-Trails"), which seeks to develop the corridor into a bike trail, against three landowners, who claim ownership of the sections of the corridor adjacent to their properties. We have before us issues of deed construction and adverse possession.

**{¶ 2}** The first issue involves construction of an 1882 deed by which part of the corridor was conveyed to a railroad company. Two of the landowners contend that the deed created a fee simple determinable and that when the property stopped being used for railroad purposes, it reverted to them as successors of the original grantors. Relying on an oft-criticized decision of this court, *In re Petition of Copps Chapel Methodist Episcopal Church*, 120 Ohio St. 309, 166 N.E. 218 (1929), the court of appeals held that the deed did not create a fee simple determinable because it did not contain reverter language. We decline to rely on *Copps Chapel*, but based on the plain language within the four corners of the deed, we nonetheless affirm the decision below that the deed created a fee simple absolute.

{¶ 3} The second set of issues involves the court of appeals' determination that there exist genuine issues of material fact that preclude summary judgment in favor of Rails-to-Trails on the three landowners' adverse-possession claims. To prove adverse possession, claimants must show that they had open, notorious, and exclusive possession for 21 years. *Grace v. Koch*, 81 Ohio St.3d 577, 692 N.E.2d 1009 (1998), syllabus. Our focus here, as it was in the courts below, is on the exclusivity of the landowners' possession. We are asked to determine whether licenses that the railroad company that previously owned the corridor granted to two telecommunications companies for fiber-optic cables, and associated corridor-maintenance activities by the companies, are sufficient to defeat the landowners' claims that for 21 years, they exclusively possessed the land. We hold that the licenses alone fail to demonstrate that the landowners' possession was not exclusive. We further hold that while activities undertaken on the corridor pursuant to licenses *could be* sufficient to interrupt exclusivity, here genuine issues of material fact about the activities preclude summary judgment.

{¶ 4} We also must determine whether activities undertaken by the railroad company were sufficient to negate the exclusivity element of the landowners' adverse-possession claims. We hold that for two of the three landowners issues of fact exist that preclude summary judgment in favor of Rails-to-Trails but not for the third. So we affirm the judgment of the court of appeals in part and reverse it in part.

## I. BACKGROUND

{¶ 5} In 2009, Rails-to-Trails purchased an old railroad corridor with the intention of converting the land into a public multipurpose trail. Three owners of adjacent properties challenge Rails-to-Trails' ownership of parts of the corridor. They are the Koprivecs, the Bilinoviches, and the Koontzes (collectively, "the landowners").

{¶ 6} In 2011, the landowners filed suit to establish their ownership of the sections of the corridor next to their respective properties. All three landowners asserted that they had adversely possessed those sections of the corridor. As the case developed, the Koontzes and the Bilinoviches also claimed that under an 1882 deed, the sections of the corridor adjacent to their properties reverted to them when the corridor stopped being used as a railroad.

### A. The 1882 Deed

{¶ 7} The Bilinoviches and the Koontzes trace ownership of the sections of the corridor next to their properties back to an 1882 conveyance to the Akron Branch Rail Road Company. The deed granted the property to the railroad company "and to its assigns forever." In its habendum clause, the deed provided that the grant was "forever for the purpose of constructing and using thereon a Rail Road." The Bilinoviches and the Koontzes construe the deed as creating a fee simple determinable. In other words, they argue, when the land stopped being used as a railroad, the sections adjacent to the properties they now own reverted back to them as the successors-in-interest of the original grantors.

### B. The Adverse-Possession Claims

{¶ 8} All three landowners assert that they adversely possessed their portions of the rail corridor. While there is some question about when the 21-year period began to run—the landowners maintain that the period commenced in 1987 when, they claim, the corridor's then owner, Consolidated Rail Corporation ("Conrail"), completed removal of its rails and wooden ties from the corridor; Rails-to-Trails counters that removal of the rails and ties from the property was not completed until 1989—the question here is whether the landowners can prove exclusive possession.

{¶ 9} Rails-to-Trails denies that the landowners had exclusive possession of their portions of the corridor. It points to the license agreements between Conrail and the telecommunications companies and to various maintenance activities

4

undertaken pursuant to those licenses by employees of the telecommunications companies on the corridor after 1987. Rails-to-Trails also claims that railroad-company employees walked along the corridor and did work to maintain the corridor after 1987.

### C. The Proceedings Below

{¶ 10} In response to the landowners' lawsuit, Rails-to-Trails filed counterclaims seeking to establish its own claim of title. On cross-motions for summary judgment, the trial court entered summary judgment in favor of Rails-to-Trails on all the landowners' claims and on Rails-to-Trails' declaratory-judgment and quiet-title claims.

{¶ 11} The trial court found that under *Copps Chapel*, the 1882 deed did not create a determinable fee because it did not contain reversionary language; that is, it did not explicitly say that the property would revert to the grantors when it ceased being used as a railroad. As for the adverse-possession claims, the trial court found that the landowners could not meet the exclusivity element because their possession had been interrupted by (1) the license agreements with the telecommunications companies, (2) the activities of the telecommunications companies on the land, and (3) the inspection of the corridor by a railroad-company employee.

{¶ 12} The Ninth District Court of Appeals affirmed in part and reversed in part. The court affirmed the trial court's judgment on the deed issue raised by the Bilinoviches and the Koontzes. Relying on *Copps Chapel*, the court held that the 1882 deed created a fee simple absolute because the deed did not contain a provision stating that the land would revert to the grantors if it was no longer used for railroad purposes. 2016-Ohio-1141, 61 N.E.3d 676, ¶ 38 (lead opinion).

{¶ 13} The court of appeals reversed the trial court's summary judgment in favor of Rails-to-Trails on the adverse-possession claims. The appellate court held that the license agreements and the activities of the telecommunications companies

conducted pursuant to those agreements were insufficient as a matter of law to defeat the exclusivity element of the landowners' adverse-possession claims. *Id.* at ¶ 15 (lead opinion). The court further determined that there were genuine issues of material fact about the activities of the railroad-company employee that made summary judgment inappropriate. *Id.* at ¶ 17 (lead opinion).[1]

**{¶ 14}** We accepted Rails-to-Trails' discretionary appeal challenging the reversal of the trial court's summary judgment on the adverse-possession issues. We also accepted jurisdiction over the cross-appeal of the Bilinoviches and the Koontzes challenging the court of appeals' decision on the deed issue.

## II. ANALYSIS

**{¶ 15}** First, we consider the deed-construction issue raised by the Bilinoviches and the Koontzes in the cross-appeal. Second, we consider the adverse-possession issues raised in Rails-to-Trails' appeal.

### A. The Deed Issue

**{¶ 16}** In rejecting the Bilinoviches' and the Koontzes' argument that the corridor sections adjacent to their properties reverted to them when the corridor stopped being used as a railroad, the court of appeals relied on the *Copps Chapel* decision. Thus, we must start with a discussion of that case.

#### 1. The Copps Chapel Decision

**{¶ 17}** In *Copps Chapel*, this court considered a deed conveying property to a church. The habendum clause contained the phrase, "To have and to hold * * * unto the said grantees and their successors * * * so long as said lot is held and used for church purposes." 120 Ohio St. at 311, 166 N.E. 218. Under longstanding

---

[1] Two opinions were issued at the court of appeals—the lead opinion and an opinion concurring in judgment only—and the third judge concurred in judgment only without opinion. The judge who authored the opinion concurring in judgment only agreed "with the majority's disposition of the case" but wrote separately to clarify why she believed the telecommunications companies' activities did not defeat the adverse-possession claims. 2016-Ohio-1141, 61 N.E.3d 676, at ¶ 42 (Hensal, P.J., concurring).

principles of deed interpretation, such language—"so long as"—had been understood to create a fee simple determinable; that is, if the property ceased to be "held and used for church purposes," it would revert to the grantor. But in *Copps Chapel*, the court held that "without any provision for forfeiture or reversion, such statement is not a condition or limitation of the grant." *Id*. at syllabus. Thus, *Copps Chapel* seemed to announce a rule that the only way that a determinable fee could be created was by including language explicitly saying that the property would revert to the grantor upon the occurrence of a stated event.

{¶ 18} The court of appeals below held that the 1882 deed in this case did not create a fee simple determinable because "[l]ike the deed[] in *Copps Chapel*," it "does not contain a provision stating that upon the grantee's failure to use the corridor for railroad purposes, ownership of the corridor reverts to the grantor." 2016-Ohio-1141, 61 N.E.3d 676, at ¶ 38 (lead opinion). The court concluded that the "lack of this provision is critical and it precludes both the Bilinoviches and the Koontzes from claiming a possibility of reverter in the portions of the railroad corridor abutting their properties." *Id.*

{¶ 19} In relying on *Copps Chapel*, the court of appeals alluded to its questionable underpinnings: the court cited an opinion from the Tenth District Court of Appeals "noting that '[w]hile the decision in *Copps Chapel* has been frequently criticized by scholars, it is still the rule of law of Ohio.' " *Id*. at ¶ 36 (lead opinion), quoting *Kauble v. Cooley*, 10th Dist. Franklin No. 86AP-822, 1988 WL 4673, *1 (Jan. 19, 1988). The court of appeals' reliance on *Copps Chapel* is understandable. Before today, we had not explicitly addressed the continuing import of the case. But as we explain, going forward, there is no longer reason to rely on *Copps Chapel*.

{¶ 20} *Copps Chapel* made Ohio an outlier. Critics "were quick to point out that the * * * court failed to recognize that under orthodox doctrines the church had only a determinable fee, and that upon abandonment of the use for church

purposes a possibility of reverter reserved by implication in the grantor became possessory."  Lynn and Ramser, *Applying the Rule Against Perpetuities to Functional Equivalents: Copps Chapel and the Woburn Church Revisited*, 43 Iowa L.Rev. 36, 37 (1957).  Indeed, "the phrase *so long* or *as long as* ha[d] been recognized as sufficient" to create a determinable interest "since before the days of [the 16th-century legal commentator Edmund] Plowden."  (Italics sic.)  O'Meara, *Determinable Fees*, 3 U.Cin.L.Rev. 491, 493 (1929); *see also Recent Case Notes*, 39 Yale L.J. 123, 135 (1929).  The dean of the Ohio State University College of Law was said to have scoffed: "[T]he decision did two things.  It decided the case before it and it introduced a mischief into the land law of Ohio which will plague the bench and bar for years."  *Clark v. Smith*, 89 Ohio Law Abs. 229, 243, 184 N.E.2d 695 (C.P.1962).  *Copps Chapel* was described as "unique in the misconception of the defeasible fee exhibited by court and counsel."  Agnor, *Defeasible Fees* 282 (1955).

### 2. *Moving Away from* Copps Chapel

{¶ 21} In the years since *Copps Chapel*, our jurisprudence has moved in a different direction.  Soon after the case was decided, lower courts began to limit its reach.  Most frequently, courts have distinguished *Copps Chapel* based on a fact not relied on in the decision—that the "so long as" language appeared in the habendum clause of the deed rather than its granting clause.  Thus, when limiting language is found in the granting clause of a deed, Ohio courts have found that a fee simple determinable was created even without the express reservation of a reversionary interest.  *See*, *e.g.*, *Schurch v. Harraman*, 47 Ohio App. 383, 389, 191 N.E. 907 (3d Dist.1933); *Walker v. Lucas Cty. Bd. of Commrs.*, 73 Ohio App.3d 617, 624, 598 N.E.2d 101 (6th Dist.1991).  Courts have used other ways to get around *Copps Chapel* as well.  For example, in one case, a court found the words "so long as the same shall be occupied as a site for a school house and no longer" enough to create a determinable fee, even without explicit reversionary language.

*Lebanon Village School Dist. Bd. of Edn. v. Hollingsworth*, 56 Ohio App. 95, 97, 10 N.E.2d 25 (1st Dist.1936).

{¶ 22} This court has not mentioned *Copps Chapel* in an opinion in over half a century. *See Ohio Soc. for Crippled Children & Adults v. McElroy*, 175 Ohio St. 49, 54, 191 N.E.2d 543 (1963). While lower courts have taken bites out of its holding, our opportunities to overrule the decision or further distance ourselves from it have been few and far between. Nonetheless, a careful reading of our caselaw of the past seven decades makes clear that the principles of deed construction that we have developed in that time make continued reliance on *Copps Chapel* inappropriate.

{¶ 23} The animating principle in our deed jurisprudence has been to look to the language of the four corners of the deed and to construe the deed based on its plain terms. Thus, in *Hinman v. Barnes*, 146 Ohio St. 497, 66 N.E.2d 911 (1946), we announced our adherence to the " 'modern and prevalent rule for determining the estate conveyed by a deed,' which rule is 'that if the intention of the parties is apparent from an examination of the deed "from its four corners," it will be given effect regardless of technical rules of construction.' " *Id.* at 508, quoting *Sherman v. Petroleum Exploration*, 280 Ky. 105, 110, 132 S.W.2d 768 (1939). The court did not overrule *Copps Chapel* in *Hinman*, but it did attempt to place it within its framework of construing a deed based on the plain language of the four corners of the deed. The court noted that "the real basis" for the *Copps Chapel* decision was that in " 'taking the deed by its four corners, it shows that the grantor intended to convey, and did convey, to the grantees all of his estate in the land.' " *Hinman* at 507-508, quoting *Copps Chapel*, 120 Ohio St. at 315, 166 N.E. 218. One can certainly question whether the four corners of the deed in *Copps Chapel* showed any such thing, but *Hinman* nonetheless stands for the principle that it is the plain language of the deed that matters.

**{¶ 24}** In the years since *Hinman*, we have followed its core holding and looked first to the plain language of the deed to determine questions of interpretation. *See Jolliff v. Hardin Cable Television Co.*, 26 Ohio St.2d 103, 106, 269 N.E.2d 588 (1971); *Portage Cty. Bd. of Commrs. v. Akron*, 109 Ohio St.3d 106, 2006-Ohio-954, 846 N.E.2d 478, ¶ 58. Lower courts in Ohio have followed suit. *See, e.g.*, *Cartwright v. Allen*, 12th Dist. Fayette No. CA2011-10-025, 2012-Ohio-3631, ¶ 12; *Snyder v. Monroe Twp. Trustees*, 110 Ohio App.3d 443, 448, 674 N.E.2d 741 (2d Dist.1996).

**{¶ 25}** *Copps Chapel* runs contrary to this central tenet: that courts should give effect to the intention of the grantor as expressed within the four corners of the deed. Presumably, when a grantor conveys a property to another "for so long as it is used for X," she means exactly that—that she intends for the property to be held by the grantee for so long as it is used for X. When the property stops being used for X, it reverts to the grantor. That would have been the result at common law, and that is the result that one gets from the "modern" rule set forth in *Hinman*. But *Copps Chapel* says something different—it is not the grantor's intention as evidenced by the four corners of the deed that matters but, rather, whether there was an explicit reservation of a right of reverter.

**{¶ 26}** Imagine a nature lover who conveys the idyllic woodland adjacent to his house to a municipality for "so long as the property is used for park purposes." If the town decides to convert the woods into a municipal dump, the follow-the-grantor's-intention principle would mandate that the property be returned to the grantor. But the rule in *Copps Chapel* says that absent reverter language, we must disregard the grantor's intent and the plain language of the deed. To put it another way, the rule in *Copps Chapel* is incompatible with our caselaw that says look to the plain language of the deed so as to honor the grantor's intent.

**{¶ 27}** It is true that for the last 90 years or so, astute conveyors of real estate would have been aware of *Copps Chapel* and been able to include appropriate

reversionary language. But as this case demonstrates, from time to time, issues still arise from deeds that predate *Copps Chapel*. Moreover, even for deeds drafted since *Copps Chapel*, it would seem only fair that we honor the intent of the grantor.

{¶ 28} Thus, while we realize that *Copps Chapel* has survived almost 90 years without being explicitly overturned, we conclude that its underpinnings, our subsequent caselaw, its diminishment by Ohio courts, and its unnecessariness in determining the intent of the parties to a deed make it an unsuitable precedent on which to decide the issue before us. Thus, we will analyze the deed-construction issue in front of us without reliance on *Copps Chapel*.

### 3. *The Four Corners of the Deed Evince an Intent to Convey a Fee Simple Absolute*

{¶ 29} The first rule of deed construction in Ohio is that when the parties' intentions are clear from the four corners of the deed, we will give effect to that intention. *Hinman*, 146 Ohio St. at 508-509, 66 N.E.2d 911; *accord* 9 *Thompson on Real Property*, Section 82.13, at 722-723 (Thomas Ed.2017). Here, both the granting clause—"[t]he words that transfer an interest in a deed," *Black's Law Dictionary* 816 (10th Ed.2014)—and the habendum clause—"the part of a * * * deed * * * that defines the extent of the interest being granted and any conditions affecting the grant," *id*. at 825—convey the property to the railroad company without limitation. The granting clause provides that the grantors "freely Grant bargain sell and convey unto the said Akron Branch of the Cleveland and Pittsburgh Rail Road Company and to its assigns forever" the property in question. The habendum clause again represents that the grant is "forever":

> To Have and to Hold said premises unto the said Akron Branch of the Cleveland and Pittsburgh Rail Road Company and to its assigns forever for the purpose of constructing and using thereon a Rail Road and other works connected therewith under and by virtue of

> the several acts of the Legislature of the state of Ohio incorporating
> and regulating said Akron Branch Rail Road Company.

The "forever" language is a strong indication of an intent to convey a fee simple absolute; in a fee-simple conveyance to a corporation, the words "heirs" or "successors" are not necessary, 1 Tiffany, *Law of Real Property*, Section 29, at 41 (3d Ed.1939). "An estate in fee simple absolute is created in a corporation * * * by an otherwise effective conveyance * * * of land without the use of words of succession, unless an intent is expressed in the conveyance to create an estate other than an estate in fee simple absolute." Restatement of the Law 1st, Property, Section 34, at 96 (1936).

**{¶ 30}** Despite the unequivocal conveyance to the railroad company and its assigns forever, the Bilinoviches and the Koontzes argue that the deed created only a fee simple determinable. They base this argument on the fact that the habendum clause states that the conveyance is "for the purpose of constructing and using thereon a Rail Road."

**{¶ 31}** "A 'determinable fee' has been defined as a fee-simple estate to a person and his heirs, with a qualification annexed providing that it must terminate whenever the qualification is at an end." 2 *Thompson on Real Property*, Section 20.02, at 107. The estate ends automatically upon the happening of the contingency, without any further act of the grantor or the grantor's heirs. *Id*. at 108. To create such an estate, deeds use words such as "until," "during," "so long as," and the like. *Id*. at 145.

**{¶ 32}** Here, the conveyance does not contain any language that limits the conveyance, no words that suggest termination. True, the habendum clause says "for the purpose of constructing and using thereon a Rail Road." But by its plain terms, this kind of language simply describes the reason for the conveyance. *See, e.g*., *Ohio Soc. for Crippled Children & Adults, Inc.*, 175 Ohio St. at 51, 191 N.E.2d

12

543. Significantly, the language does not condition the railroad company's right to hold the estate on its use as a railroad. "Unless a conditional estate is created by the express language of a deed or will, the grantor or testator will be conclusively presumed to have intended a fee simple." 2 *Thompson on Real Property*, Section 17.07, at 398.

{¶ 33} The Bilinoviches and the Koontzes argue that the 1882 deed's inclusion of the phrase "under and by virtue of the several acts of the Legislature of the state of Ohio incorporating and regulating said Akron Branch Rail Road Company" limits the extent of the interest granted and incorporates language from the 1835 act passed by the General Assembly to incorporate the Akron Branch Rail Road Company. The language that they claim the deed incorporates is found in Section 3 of the 1835 act, which sets forth laws regarding railroad operation: "[The Akron Branch Rail Road Company] shall be capable in law of purchasing, holding, selling, leasing and conveying estates, real personal and mixed, so far as the same shall be necessary for the purposes hereinafter mentioned, and no further." 34 Ohio Laws 576, 577.

{¶ 34} Although the 1882 deed does reference "the several acts of the Legislature of the state of Ohio incorporating and regulating said Akron Branch Rail Road Company," that language appears in the "for the purpose of" section of the habendum clause. Read in the context of the entire habendum clause, the "several acts" language does not function to incorporate the language of those acts but, rather, indicates that the property has been transferred for the purpose of constructing and maintaining both a railroad and other facilities that Ohio law allows to be operated in connection with the railroad. Furthermore, and most significantly, no language from any act of the legislature appears within the four corners of the deed.

{¶ 35} Thus, within the four corners of the deed, the parties made clear their intention to create a fee simple absolute. We therefore affirm the portion of the

Ninth District's judgment affirming the trial court's denial of the Bilinoviches' and the Koontzes' motion for summary judgment on Rails-to-Trails' counterclaims.

**B.  The Adverse-Possession Issues**

{¶ 36} Rails-to-Trails argues that the landowners all failed to exclusively possess their claimed individual sections of the abandoned railroad corridor.  It contends that the court of appeals was wrong in concluding as a matter of law that the licenses held by the telecommunications companies and their associated activities could not defeat the exclusivity of the landowners' possession.  It maintains further that the court of appeals erred in concluding that there are questions of fact as to whether activities taken by railroad-company employees interrupted the landowners' exclusive possession.

{¶ 37} Because the landowners assert separate claims to the sections of the abandoned railroad corridor abutting their own properties, we must consider each claim of exclusive possession individually.  We conclude that genuine issues of material fact remain regarding whether the activities of the telecommunications companies interrupted the exclusivity of the landowners' possession.  But we conclude that undisputed acts of a railroad-company employee were sufficient to interrupt the exclusive possession of the owners of one of the adjacent properties—the Bilinoviches.

*1.  The Requirement of Exclusive Possession*

{¶ 38} The trial court's summary judgment was based on the exclusivity element of the landowners' adverse-possession claims, and both propositions of law raised by Rails-to-Trail focus on this element.  "Adverse possession in law means exclusive possession, where some one else is excluded who claims the right to possess." *Herrick v. Cleveland*, 4 Ohio C.D. 684, 7 Ohio C.C. 470, 481-482 (1893).

{¶ 39} The general rule is that "exclusive possession can be shown by acts that would ordinarily be exercised by an owner in appropriating land to the owner's

own use and to the exclusion of others." 16 *Powell on Real Property*, Section 91.06 (2017). "[T]he possessor must use and occupy the land as his own and 'exclude all others from similar rights.' " *Richardson v. Blersch*, 1st Dist. Hamilton No. C-930042, 1994 WL 114301, *3 (Apr. 6, 1994), quoting *Pennsylvania R.R. Co. v. Donovan*, 111 Ohio St. 341, 351, 145 N.E. 479 (1924). Thus, to satisfy the exclusivity requirement, "the claimant's possession need not be absolutely exclusive; it need only be a type of possession that would characterize an owner's use." 16 *Powell on Real Property*, Section 91.06.

### 2. Activities of the Telecommunications Companies

{¶ 40} The Ninth District concluded that Conrail's license agreements with the telecommunications companies and the activities of the companies under the agreements were insufficient "as a matter of law" to defeat the landowners' adverse-possession claims. In analyzing Rails-to-Trails' challenge to this conclusion, we start with the settled proposition that the adverse possessor's possession must be exclusive not only of the true owner but also "third persons entering the land * * * claiming to have permission to be on the premises from the true title holder." 2016-Ohio-1141, 61 N.E.3d 676, at ¶ 12 (lead opinion); *accord Walls v. Billingsley*, 3d Dist. Allen No. 1-92-100, 1993 WL 135808, *2 (Apr. 28, 1993), citing 4 Tiffany, *Law of Real Property*, Section 1141, at 736 (3d Ed.1975); *Reagan v. Sturges*, 11th Dist. Portage No. 2016-P-0001, 2016-Ohio-8226, ¶ 15, citing *Walls* at *2; *Welch v. Marlow*, 5th Dist. Morgan No. 08 CA 8, 2009-Ohio-6145, ¶ 28, citing *Walls* at *2. A licensee fits squarely within this classification of third persons. By definition, a licensee is "a person who enters the premises of another by permission or acquiescence." *Light v. Ohio Univ.*, 28 Ohio St.3d 66, 68, 502 N.E.2d 611 (1986); *see also Black's Law Dictionary* at 1061 (defining "licensee" as "[s]omeone who has permission to enter or use another's premises"). Thus, we have little difficulty concluding that a licensee of an owner may defeat the exclusivity of an adverse possessor's claim if the licensee performs actions on

the land that are inconsistent with the claimant's exclusive possession. The court of appeals erred in holding otherwise.

{¶ 41} That is not to say that a license—without more—is sufficient to defeat an adverse-possession claim. The mere existence of a license (or an underground utility that exists pursuant to a license) does not by itself interfere with the exclusivity of the adverse possessor's control of the land. And while caselaw on the topic is limited, other jurisdictions have held that the existence of a license or easement for utilities on the land does not by itself interrupt the exclusivity of a claimant's adverse possession. For instance, in *Jacobs v. Bay Dev. Co.*, Mich.App. Nos. 183964 and 183965, 1997 WL 33350554, *2-3 (Apr. 15, 1997), the court held that a railroad company's license to a power company to erect and maintain a pole line along an abandoned right-of-way did not affect the exclusivity of the claimants' possession. Similarly, in *Rieddle v. Buckner*, 629 N.E.2d 860, 862 (Ind.App.1994), the presence of a utility easement did not defeat an adverse-possession claim.

{¶ 42} Although a license in and of itself is insufficient to interrupt a claimant's possession, the claimant's possession must be exclusive as to a person on the property with the permission of the title holder. If a licensee is on the property of the title holder performing acts that would ordinarily require the permission of the owner, the exclusivity of the adverse-possession claimant would be interrupted. This is consistent with the overriding idea behind exclusivity—that claimants "must show that their possession of the [property] was the kind of possession that would characterize an owner's use," *Schoeller v. Kulawiak*, 118 Or.App. 524, 528, 848 P.2d 619 (1993). The presence on the land claimed by the adverse possessor of someone performing activities with the permission of the title holder belies the kind of possession that would characterize an owner's use.

{¶ 43} Having established that the activities of a licensee pursuant to its license may interrupt the exclusive possession of an adverse-possession claimant,

16

we analyze below the particular activities of the telecommunications companies in relation to the exclusivity of the landowners' possession.

*a. The licensees' activities on the Bilinovich section*

{¶ 44} Rails-to-Trails argues that the activities of Conrail's licensees as a matter of law interrupted the exclusivity of the Bilinoviches' possession and points to a number of interactions between Brian Bilinovich and the telecommunications companies. Bilinovich testified that on two occasions, employees of the telecommunications companies came onto the railroad corridor at his request to mark the location of the utility lines so that he could do work on the Bilinoviches' property. Bilinovich also testified that he gave an employee of one of the telecommunications companies permission to enter the section of the corridor adjacent to the Bilinoviches' property in order to trim trees.

{¶ 45} A claim of exclusive possession is not defeated by one who uses the land with the permission of the adverse-possession claimant and without "asserting, by word or act, any right of ownership or possession." 4 Tiffany, *Law of Real Property*, Section 1141, at 736 (3d Ed.1975). Thus, if Bilinovich's testimony is credited, none of the aforementioned activities of the telecommunications companies interrupted his exclusive possession because they were all done with his permission and without any assertion of ownership by the companies.

{¶ 46} In addition to the interactions between the licensees and Bilinovich, Rails-to-Trails asserts that a large right-of-way clearing project by one of the telecommunications companies in 2007 interrupted the Bilinoviches' exclusive possession. The right-of-way clearing project purportedly encompassed the entire eight-mile length of the abandoned rail corridor. This maintenance project that affected the railroad company's real estate and not just the licensees' license was the type of possessory activity that one would expect to be taken by an owner or someone acting with the owner's permission. Here, however, there is an issue of fact whether the clearing activity occurred on the Bilinovich section. In an

affidavit, Bilinovich stated that he did not see anyone performing clearing activity on the section and did not see any indication that such clearing had been performed. He also averred to keeping the corridor free from brush himself after 1996. The project manager of the company hired to perform the clearing testified that if the right-of-way was already clear, his crew would continue on to the next obstructed point along the corridor. If Bilinovich had already cleared his section of the corridor, then, the clearing project would have skipped that section.

{¶ 47} Thus, we conclude that there are genuine issues of material fact as to whether the activities of the telecommunications companies interfered with the Bilinoviches' exclusive possession.

> b. *The licensees' activity on the Koontz and Koprivec sections*

{¶ 48} Rails-to-Trails relies on the 2007 clearing project to defeat the Koontzes' and the Koprivecs' claims of exclusive possession. Joseph Koontz and Don Koprivec both swore in affidavits to not having seen anyone else (besides Brian Bilinovich) doing clearing activity in 2007 or having seen any indication of such clearing having been done. Like Bilinovich, they each claimed that they attended to the brush in their own sections over time. If true, then as with the Bilinoviches' section, the property manager would have skipped performing the clearing on their sections. Although the 2007 clearing project is the type of activity that could interrupt the exclusivity of a claimant's possession, there is a question of fact as to whether the telecommunications companies performed that activity on the sections of the corridor claimed by the Koontzes and the Koprivecs. Thus, we cannot say as a matter of law that the telecommunications companies performed any acts sufficient to interfere with the exclusivity of the Koontzes' and the Koprivecs' possession.

### 3. *Activities of the Prior Title Holder*

{¶ 49} Rails-to-Trails also asserts that the Ninth District failed to take into account the actions of Conrail employees on the disputed property before Rails-to-Trails took title to the property.

#### a. *Railroad-company activities on the Koontz section*

{¶ 50} In arguing that the activities of the railroad company were sufficient to defeat the exclusivity of the Koontzes' possession, Rails-to-Trails relies on a statement in an affidavit submitted by Judith Wiley, the Koontzes' predecessor-in-interest. Wiley averred that in the early to mid-1990s, she encountered a person on the right-of-way who identified himself as a railroad-company employee and that he advised her "not to trespass on the Railroad Right-of-Way."

{¶ 51} Wiley's statement is not directly contradicted, and, if that was all there was to it, the railroad company's activity in defending its corridor would seem a sufficient act of ownership to defeat summary judgment. But there is more. In her affidavit, Wiley also claimed that after the corridor was abandoned in 1989, the only activity she ever performed on the corridor was to remove snow from her driveway and, further, that none of her family members ever conducted activity on the corridor. But as the court of appeals noted, the landowners introduced substantial evidence contradicting Wiley's testimony, including affidavits from her real-estate agent, several of the landowners, and another neighbor. According to this evidence, the Wiley family was vigilant about ejecting trespassers from the railroad corridor and used the corridor for a variety of purposes.

{¶ 52} Thus, the credibility of Wiley is at issue. We agree with the court of appeals that because the landowners' "evidence directly contradicts Ms. Wiley's averments in her affidavit," 2016-Ohio-1141, 61 N.E.3d 676, at ¶ 22 (lead opinion), there remain genuine issues of material fact. Accordingly, we conclude that the court of appeals did not err in reversing the grant of summary judgment as to the Koontzes' adverse-possession claim.

### b. *Railroad-company activities on the Bilinovich section*

{¶ 53} In regard to the Bilinovich section, Rails-to-Trails relies on Wiley's statement referenced above as well as interactions between Solomon Jackson, a railroad-company employee, and Brian Bilinovich. It is undisputed that on behalf of the railroad company, Jackson had extensive discussions with Bilinovich about a sale or lease of the corridor to Bilinovich. They exchanged letters and, according to Jackson, had approximately six conversations about a possible sale. In early 2002, after receiving an offer letter from Bilinovich to purchase the entire corridor, Jackson went to the Bilinovich section of the corridor to discuss a possible sale. They walked the corridor together for one to two hours. Ultimately, they were not able to reach a deal because at the time, the railroad company was in the middle of a complex corporate organization and was willing to offer Bilinovich only a lease. After the site visit, according to Jackson, the two continued to discuss a possible deal, engaging in another half dozen or so conversations.

{¶ 54} It is hard to imagine a more direct assertion of ownership over a piece of property than a title holder standing on his property, inspecting it with another, and offering to lease it to that person. Nevertheless, the court of appeals disregarded these activities. In reaching this conclusion, the court relied on *McAllister v. Hartzell*, 60 Ohio St. 69, 53 N.E. 715 (1899).

{¶ 55} In *McAllister*, a trial court had refused to provide a jury instruction that said that an adverse-possession claimant's offer to purchase property would stop the running of the 21-year period. Instead, the court had instructed the jury that an offer "would be evidence bearing upon the question whether or not she held the property adversely" and should be considered by the jury. *Id.* at 82.

{¶ 56} We find nothing in *McAllister* that impacts the question before us. The issue in *McAllister* dealt with the adverse possessor's conduct—whether the purchase offer affected the adversity of possession. The issue here deals with the title holder's conduct—whether the title holder asserted ownership of the property,

thereby destroying the exclusivity of the claimant's possession. Furthermore, this is not a case in which someone in possession of the property made an offer to a title holder who had had no contact with the property; here, the title holder came onto the property and walked it with the adverse-possession claimant with the express purpose of entering into a transaction involving the property.

{¶ 57} Through Jackson's entering onto the property and offering to lease it to Bilinovich, the railroad company was "asserting, by word or act, [a] right of ownership or possession," 4 Tiffany, *Law of Real Property*, Section 1141, at 736 (3d Ed.1975). The railroad company unequivocally took action on the property of the type that would be taken by an owner, interrupting the exclusive possession of the Bilinoviches. The court of appeals therefore erred in reversing the trial court's grant of summary judgment in favor of Rails-to-Trails on the Bilinoviches' claim.

*c. Railroad-company activities on the Koprivec section*

{¶ 58} Rails-to-Trails has not made any argument before this court about actions of railroad-company employees on the section of the corridor adjacent to the Koprivecs' property that it contends are a sufficient basis for summary judgment. (In regard to the Koprivecs, its arguments focus solely on the actions of the telecommunications companies.) Accordingly, the court of appeals did not err in reversing the trial court's grant of summary judgment as to the Koprivecs.

### III. CONCLUSION

{¶ 59} We conclude that the 1882 deed granted an interest in fee simple to the railroad company, the grantee, and that there was thus no reversion of the property to the successors-in-interest of the grantors as was alleged by the Bilinoviches and the Koontzes. In regard to adverse possession by the landowners, we conclude that the trial court correctly entered summary judgment in favor of Rails-to-Trails on the Bilinoviches' claim but not on the claims of the Koontzes and the Koprivecs. Accordingly, we affirm in part and reverse in part the judgment of

the Ninth District Court of Appeals, and we remand the cause for further proceedings.

Judgment affirmed in part<br>and reversed in part,<br>and cause remanded.

KENNEDY and FRENCH, JJ., concur.

FISCHER, J., concurs in judgment only, with an opinion joined by O'CONNOR, C.J.

O'DONNELL, J., concurs in part and dissents in part, with an opinion.

O'NEILL, J., concurs in part and dissents in part, with an opinion.

_____

**FISCHER, J., concurring in judgment only.**

{¶ 60} I agree with the majority opinion's conclusions that the 1882 deed granted an interest in fee simple to the railroad company and that the trial court correctly entered summary judgment in favor of appellant, Rails-to-Trails of Wayne County, on the adverse-possession claims of appellees Brian and Laura Bilinovich but not on the adverse-possession claims of appellees Joseph and Michelle Koontz and Don and Carolyn Koprivec. I write separately because I would not use this appeal as a vehicle for effectively overruling *In re Petition of Copps Chapel Methodist Episcopal Church*, 120 Ohio St. 309, 166 N.E. 218 (1929).

{¶ 61} The majority opinion states that "going forward, there is no longer reason to rely on *Copps Chapel*." Majority opinion at ¶ 19. However, *Copps Chapel* has been a part of our jurisprudence for nearly 90 years and has become entrenched in Ohio law, and no party has challenged the validity of that decision in this case. We should be particularly mindful of the principles underlying stare decisis in the context of real-estate law, for "adherence to precedent is necessary to the stability of land titles and commercial transactions entered into in reliance on

22

the settled nature of the law." *Bogle Farms, Inc. v. Baca*, 122 N.M. 422, 1996-NMSC-051, 925 P.2d 1184, ¶ 29, citing *Giles v. Adobe Royalty, Inc.*, 235 Kan. 758, 767, 684 P.2d 406 (1984).

{¶ 62} These principles are overlooked in the majority opinion, which concludes that *Copps Chapel* is no longer good law without conducting the analysis required to overrule a decision that this court established in *Westfield Ins. Co. v. Galatis*, 100 Ohio St.3d 216, 2003-Ohio-5849, 797 N.E.2d 1256, paragraph one of the syllabus. As the majority opinion notes, the court of appeals' lead opinion, in relying on *Copps Chapel*, reached the same conclusion on the deed issue that this court reaches today. Because the validity of *Copps Chapel* is not directly at issue in this case, we should avoid disturbing any reliance Ohioans have placed on that decision. I accordingly concur in judgment only.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

**O'DONNELL, J., concurring in part and dissenting in part.**

{¶ 63} Respectfully, I concur in part and dissent in part.

{¶ 64} I would reverse the judgment of the court of appeals as to the issues of adverse possession and reinstate the judgment of the trial court.

_____

**O'NEILL, J., concurring in part and dissenting in part.**

{¶ 65} I join the majority's holding concerning the deed issue. I also join the majority's holding that the exclusivity required to prove an adverse-possession claim is interrupted by a title holder's licensee acting on the property in ways that would normally require the permission of the owner. And I join the majority's holding that the trial court correctly granted summary judgment in favor of appellant, Rails-to-Trails of Wayne County ("RTT"), on the adverse-possession claim of appellees Brian and Laura Bilinovich. Yet, I must dissent from the

remainder of the majority opinion, because I would hold that the trial court also correctly granted summary judgment to RTT on the claims of appellees Don and Carolyn Koprivec and Joseph and Michelle Koontz. My view of the record is that there are no genuine disputes of material fact remaining for a jury to consider on those claims.

{¶ 66} The present saga started in either 1987, 1988, or 1989. During that time frame, Consolidated Rail Corporation ("Conrail") owned a railroad corridor that abutted two properties and divided a third. Two of the three properties were owned by Judith Wiley and her family, and one was owned by the Koprivecs. The Wileys ultimately sold their two properties—to the Bilinoviches in 1996 and to the Koontzes in 1998.

{¶ 67} Depending on whom a jury would believe, Conrail removed the train tracks from the rail corridor either by the end of 1987 or in two phases in 1988 and 1989. And depending on whom a jury would believe, the Wileys either "did nothing on the Railroad Right-of-Way" (other than remove snow from the portion of their driveway that crossed it) or frequently traveled on the rail corridor, threatened trespassers on the corridor with guns, allowed people to park on it, and listed it as part of the property sold to the Bilinoviches.

{¶ 68} Regardless, in October 2009, RTT purchased the rail corridor by quitclaim deed. On two occasions in November 2009, officers of RTT rode ATVs along the *entire* length of the rail corridor. Each time, Donald Noble, the president of RTT, observed gates across the trail, but none of them were shut or locked. During one of these instances, Noble was approached by Brian Bilinovich, who claimed in his affidavit that he treated Noble's entry as a trespass. There is no testimony that the officers of RTT were told or forced to leave, and they continued to ride the entire corridor twice that day. The other affidavits upon which the Koprivecs, the Bilinoviches, and the Koontzes (collectively, "the landowners") rely

claim a lack of knowledge regarding these actions of the RTT officers in November 2009.

{¶ 69} If that had been the only evidence presented on summary judgment, then this lawsuit would turn on two genuine issues of material fact that the landowners would have been entitled to present to a jury to resolve: (1) whether 21 years elapsed between the time that Conrail removed the tracks and the time that the RTT officers surveyed the rail corridor shortly after taking title to it and (2) if so, whether the Wileys adversely possessed the land for a sufficient period that the Bilinoviches and the Koontzes could tack on their own periods of alleged possession to make a total of 21 years of uninterrupted possession.

{¶ 70} But that was not the full scope of the case presented to the trial court on summary judgment. Wiley offered unrebutted testimony that a railroad-company employee walking along the rail corridor in the "early to mid 1990s" told her not to trespass on the land. Viewing that testimony with all due deference to the Koontzes, it is simply impossible to reconcile that fact with their claim of 21 years of *continuous* possession of the section of the rail corridor bordering their property. That is no less true even if Wiley and her family chased trespassers off the rail corridor with guns or walked and parked cars on it or purported to sell it to the Bilinoviches.

{¶ 71} It may be that the Wiley family did exclusively possess the land for many years by parking on the property and threatening other trespassers with a weapon. But by offering testimony that an employee of the title holder told her to stay off the land while he stood on it, she has offered evidence that her own possession was interrupted in a meaningful way. The affidavit upon which the Koontzes rely professes only a lack of knowledge regarding a railroad-company employee's presence or actions on the rail corridor in the 1990s. Wiley's affidavit is clear and unequivocal. There is no genuine dispute that her possession was

interrupted, and that is the only material question of fact for the Koontzes because it defeats their claim without any further inquiry regarding the other elements of adverse possession. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted"). Though there are genuine issues of fact regarding Wiley's possession of the land before and after her possession was interrupted, those questions are immaterial in light of the fact that there is unrebutted testimony that her possession *was* interrupted.

{¶ 72} The Koontzes simply cannot claim continuous possession of their section of the rail corridor and leave Wiley's testimony on this point unanswered. The majority casts the dispute over Wiley's other actions and interactions on the land as a credibility issue. Fair enough; she denied doing anything but clearing snow from the land. But absent rebuttal testimony that no railroad-company employee told Wiley to stay off the rail corridor in the 1990s, there is no credibility issue with Wiley's testimony on that point.

{¶ 73} There is also substantial unrebutted evidence establishing entries by employees of a contractor hired by a third-party licensee during any 21-year period of exclusive possession that the landowners could conceivably claim. In late 2006 or early 2007, AT&T Communications, Inc., hired HLG Consulting to clear trees, brush, and other obstructions from the rail corridor. AT&T operated a fiber-optic cable running along the rail corridor pursuant to a 1984 license agreement with Conrail. According to a "Memorandum of Agreement" recorded in the land records in 1995 by Conrail, AT&T purchased a right to "construct, install, operate, maintain, and repair" a fiber-optic cable along the rail corridor. Edward Hughes worked as a project manager for HLG Consulting in 2007, and he personally

oversaw the clearing project, kept track of where his crews worked, and visited the rail corridor to "make sure that work was being completed." The project required "making sure that there [was] access" along the rail corridor "in its entirety," including "the disputed trail property." The affidavits upon which the landowners rely admit to a lack of knowledge regarding any such activity by HLG Consulting.

{¶ 74} Stating a lack of knowledge is not a rebuttal. An affiant or deponent claiming "I have no knowledge" or "I never saw" an event or "Wiley never told me about the railroad employee" has not met the Civ.R. 56(E) requirement that affidavits "shall be made on personal knowledge" and "shall set forth such facts as would be admissible in evidence." As a purely logical matter, someone cannot rebut testimony that an event occurred by claiming that he or she never saw it happen. If a railroad company's licensee hires a crew of workers to chop a tree down in the rail corridor and Don Koprivec swears that he "did not observe" it, does the tree make a sound when it falls? An expression of knowledge beats an expression of a lack of knowledge without having to ask a jury to sort things out.

{¶ 75} The majority engages in conjecture unsupported by the record when it claims that HLG Consulting "would have skipped" the well-maintained Koontz and Koprivec sections, majority opinion at ¶ 46. This is an unreasonable inference from testimony that the landowners were aware only of their own work clearing brush on the land. Even if the majority is right that HLG Consulting merely inspected these sections and moved on whenever it found that the disputed sections were well-groomed, I cannot agree that the act of entering and inspecting the land to assure access to the fiber-optic cable falls outside of the category of conduct that "would ordinarily require the permission of the owner," *id.* at ¶ 42.

{¶ 76} The trial court in this matter granted summary judgment in favor of RTT because the undisputed testimony showed that the landowners could not have exclusively possessed the land at issue for any uninterrupted 21-year period. As

shown above, the record shows undisputed instances of the title holder and of the work crews hired by the title holder's licensee using—or in other words, possessing—the land. The only remaining question was a legal one: whether any party was entitled to judgment *as a matter of law*. The trial court resolved that question in favor of RTT: "[RTT's] use of [its] land, and permitted use by a third party, clearly interrupts any exclusive use of the land by the [landowners]." This was a textbook example of an order correctly granting summary judgment.

{¶ 77} Pursuant to Civ.R. 56(C), a court may terminate litigation in favor of a party when that party can show that there is no genuine dispute of material fact and that construing the evidence most strongly in favor of the nonmoving party, reasonable minds can conclude only that the moving party is entitled to judgment as a matter of law. *Byrd v. Smith*, 110 Ohio St.3d 24, 2006-Ohio-3455, 850 N.E.2d 47, ¶ 10. If a party moving for summary judgment supports the motion with evidence sufficient to show that the movant is entitled to judgment in its favor, then Civ.R. 56(E) requires that the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial" by "affidavit or as otherwise provided in this rule." To show a genuine issue of material fact, the landowners had to submit rebuttal evidence calling into question the truth of RTT's evidence showing the entries made by the title holder and the work crews hired by its licensee. *Savransky v. Cleveland*, 4 Ohio St.3d 118, 118-119, 447 N.E.2d 98 (1983). But the landowners denied knowledge and thereby "rested upon the mere allegations of [their] pleadings, instead of setting forth specific facts showing that there was a genuine issue for trial," *id.* at 119.

{¶ 78} I would reinstate the trial court's entire order granting summary judgment. Therefore, I dissent in part from the majority's judgment.

———————————

Vorys, Sater, Seymour and Pease, L.L.P., Thomas H. Fusonie, and Daniel E. Shuey, for appellees Don and Carolyn Koprivec and for appellees and cross-appellants Brian and Laura Bilinovich and Joseph D. and Michelle K. Koontz.

Walter Haverfield, L.L.P., Ralph E. Cascarilla, and Bonnie S. Finley, for appellant and cross-appellee.

Chad A. Endsley, Leah Curtis, and Amy Milam, urging reversal for amici curiae Ohio Farm Bureau Federation and Wayne County Farm Bureau.

_____